Raymond SMITH, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 17106.

United States Court of Appeals
District of Columbia Circuit.

Reargued Oct. 16, 1963.

Decided Feb. 20, 1964.

Mr. Mac Asbill, Jr., Washington, D. C. (appointed by this court) with whom Mr. Charles L. Saunders, Jr., Washington, D. C., was on the brief for appellant.

Mr. William H. Willcox, Asst. U. S. Atty., for appellee. Messrs. David C. Acheson, U. S. Atty., Frank Q. Nebeker, Frederick G. Smithson, Asst. U. S. Attys., and Mr. Robert A. Levetown, Asst. U. S. Atty., at the time the brief was filed, were on the brief, for appellee. Mr. William C. Weitzel, Jr., Asst. U. S. Atty., also entered an appearance for appellee.

Mr. Lester M. Bridgeman, Washington, D. C., filed a memorandum on behalf of National Capital Area Civil Liberties Union, as *amicus curiae*.

Before BAZELON, Chief Judge, and WILBUR K. MILLER, FAHY, WASHINGTON, DANAHER, BASTIAN, BURGER, WRIGHT and McGOWAN, Circuit Judges.

DANAHER, Circuit Judge, with whom WILBUR K. MILLER, WASHINGTON, BASTIAN, BURGER and McGOWAN, Circuit Judges, join:

By indictment filed in open court November 13, 1961, this appellant was charged with two narcotics violations,[1] both counts essentially involving possession of the same 41 capsules which contained heroin. On November 17, 1961 he entered a plea of not guilty. Counsel was appointed to represent him. Trial commenced on April 16, 1962,[2] and the following day, a jury returned a verdict of guilty as indicted. On this appeal it has been argued that: (a) the trial judge erroneously instructed the jury as to the element of "possession" ; (b) the appellant's right to a speedy trial had been denied since the interval between indictment and trial aggregated 102 days; and (c) the trial judge erroneously refused to instruct the jury on the defense of entrapment.

After argument May 27, 1963,[3] a division of this court, the writer dissenting, decided that the judgment of conviction must be vacated and the indictment dismissed on the ground that the appellant's right to a speedy trial had been denied. Accordingly, the majority did not reach appellant's other contentions. On the Government's motion, a

1. The applicable statutes, 26 U.S.C. § 4704 (a) and 21 U.S.C. § 174 (1958), were importantly considered in Gore v. United States, 357 U.S. 386, 78 S.Ct. 1280, 2 L. Ed.2d 1405 (1958). At 398 of 357 U.S., at 1287 of 78 S.Ct., 2 L.Ed.2d 1405, the dissent pointed out that proof of the single fact of possession of unstamped narcotics suffices to convict a defendant of offenses under either § 4704(a) or § 174. The former speaks of the absence of taxpaid stamps as "prima facie evidence of a violation," while § 174 provides that possession of the narcotic drug "shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury."

2. Between arraignment and trial, hearings had been held on appellant's motion to suppress evidence and various other motions hereinafter referred to, including those expressing appellant's dissatisfaction with trial counsel appointed by the District Court.

3. Other developments may be noted for a more complete understanding of the background of this case. In June 1962, after the District Court had allowed the appellant to proceed in forma pauperis, this court appointed new counsel, Mac Asbill, Jr., Esquire, to represent him on appeal. By August 27, 1962, the appellant had expressed such dissatisfaction with counsel, that Mr. Asbill sought and we granted leave to withdraw. Thereafter followed repeated communications between the appellant and the Clerk of this court. In October 1962, appellant filed, pro se, a motion for the appointment of new counsel and, for the first time, a motion for release on bail. This court directed that if Mr. Asbill were not deemed by appellant to be satisfactory, no new counsel would be appointed. Appellant refused to accept Mr. Asbill as his attorney, whereupon we appointed Mr. Asbill as *amicus curiae* to argue the bail motion. On November 21, 1962, this court ordered appellant's release on bail which the appellant posted December 31, 1962. As of February 11, 1963, appellant requested the reappointment of Mr. Asbill. February 20 we entered our order that the Joint Appendix be prepared at Government expense, and after various requested extensions of time, the appeal was perfected and argued in regular course on May 27, 1963.

rehearing *en banc* was ordered,[4] and the opinion and order of the original division were vacated.

On October 23, 1961, Officers Hood and Hutcherson of the Narcotics Squad knocked on the door of Raymond Smith's apartment, announced their identity and that they were present to execute a search warrant.[5] In the front room with the appellant were his brother and two other men. Officer Hood after testifying that the appellant was on the telephone as the officers entered and announced their identity and purpose, was asked by the prosecutor:

"Q And what did he say or do when you made that announcement to him?

"A Smith then went into his shirt pocket and pulled out a package containing about 41 capsules containing powder and handed them to me."

Officer Hutcherson testified that when asked if he had any narcotics, the appellant stated that he did. "He took them out of his pocket and handed them over to Officer Hood, I saw them then and they were in a cellophene [*sic*] bag." The evidence disclosed that Officer Bonaparte, who shortly joined Officers Hood and Hutcherson, had kept the appellant on the telephone to prevent him "from running."

The appellant testified that the officers caused the men to roll up their sleeves that the police might examine their arms, and he added:

"I told them to leave those fellows alone, for whatever they were in there for these fellows don't know nothing about it, and he asked me where is the dope, and I said, what

do you mean? What dope? * * * And I asked the Officer, I will tell you where the drugs are if you promise not to bother these fellows and then I surrendered the drugs. * * *

"Q You had the drugs on you? Is that right?

"A I had them in my pocket.

"Q Which pocket?

"A In the pocket over here on this side [indicating a shirt pocket].

* * * * * *

"Q Where had you gotten these drugs?

"A Paris had given them to me before he ever went to the barber shop."

No other narcotics were found in the premises.

I

■ It has been argued that the instruction on the element of "possession" might have proved confusing to the jury, but there had been no compliance with Rule 30.[6] No written requests had been filed "at the close of the evidence." There had been no objection to the charge as given.

There was no question whatever that this appellant possessed 41 capsules containing heroin. He admitted the possession but claimed that he did not own the drugs. He testified that one Paris had asked him to hold the drugs while Paris went to a barber shop. Appellant explained that Paris was an addict like himself and that Paris said he feared possible arrest if found on the street with drugs in his possession. In the context of the case as a whole, as tried and

4. Argument before the court *en banc* was heard October 16, 1963.

5. Questions as to the issuance of the search warrant, the identity of an informant and the manner of the execution of the warrant arose at various times before and throughout the trial.

6. Rule 30 of the Federal Rules of Criminal Procedure clearly provides: "No party may assign as error any portion of the

charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection."

Depending upon the circumstances in a particular case, a statement of the claims of a defendant may be of special importance under this rule where mere "possession" is of the essence of the violation charged. See note 1, *supra*.

argued, we are satisfied the jury could not have been misled by the charge as given on this point. This is not a case calling for application of the "plain error" doctrine.

## II

■ Appellant has claimed he was denied his right to a speedy trial and has argued as a result that his conviction must be vacated and the indictment dismissed. The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial * * *."

It is clear that the rights of a defendant are not to "preclude the rights of public justice," as appears from Beavers v. Haubert.[7] The Supreme Court there said that the right is "necessarily relative" and "is consistent with delays and depends upon circumstances."[8] Delay and its effect, in short, will be tested by circumstances.[9]

Here it is urged that the lapse of 102 days between indictment and trial entitled this appellant to his release. No case has been cited which requires that result, and our extensive research has disclosed none. Contrary to appellant's claim, the authorities demonstrate that the balance between the rights of public justice and those of the accused has been upset against the Government only where the delay has been arbitrary, purposeful, oppressive or vexatious.[10]

■ Of course an accused may waive his right,[11] and he will be deemed to have done so unless the right be promptly asserted.[12]

Having in mind the principles enunciated in the cases cited, we turn to consideration of the "circumstances." After this appellant was arraigned November 17, 1961 and trial counsel had been appointed, his case was set down for January 3, 1962, to follow the December calendar with its intervening Christmas recess. A narcotics officer was on leave January 3rd, and the case was reassigned for a January 18th trial. On January 17, 1962, defense counsel appeared in court and addressed the Chief Judge in charge of assignments:

"Mr. Canfield: May it please the Court, this is in regard to United States versus Raymond Smith, Criminal 974–61. This is a matter scheduled for trial tomorrow in which I am appointed counsel by the Court.

"About two weeks ago or a little more than that, this case was set for trial on January 3rd. A few days prior thereto, I received a call from Mr. Smithson who advised me that one of the government's witnesses could not be present on that day.

7. 198 U.S. 77, 87, 25 S.Ct. 573, 576, 49 L.Ed. 950 (1905); and see as to a balance of "public justice" considerations, Williams v. United States, 102 U.S.App.D.C. 51, 53, 250 F.2d 19, 21 (1957), where the appellant had been confined for seven years.

8. 198 U.S. at 87, 25 S.Ct. at 576, 49 L.Ed. 950; the principles announced in the Beavers case were held to govern and did not amount to a denial of the right where a trial was held sixteen months after indictment in Stevenson v. United States, 197 U.S.App.D.C. 398, 278 F.2d 278 (1960).

9. Pollard v. United States, 352 U.S. 354, 361, 77 S.Ct. 481, 1 L.Ed.2d 393 (1957); King v. United States, en banc, 105 U.S.App.D.C. 193, 196, 265 F.2d 567, 570, cert. denied, 359 U.S. 998, 79 S.Ct. 1124, 3 L.Ed.2d 986 (1959).

10. See, for example, Taylor v. United States, 99 U.S.App.D.C. 183, 238 F.2d 259 (1956), where there had been no indictment for more than three years and no prosecution for two years thereafter; United States v. McWilliams, 82 U.S.App. D.C. 259, 163 F.2d 695 (1947), where the prosecution secured postponements in its effort to gather new evidence; and see the cases illustrating "oppression" in Petition of Provoo, 17 F.R.D. 183 (D.Md.), aff'd by memorandum, 350 U.S. 857, 76 S.Ct. 101, 100 L.Ed. 761 (1955).

11. Even where a 4-year delay has occurred, United States v. Lustman, 258 F.2d 475, 478 (2 Cir.), cert. denied, 358 U.S. 880, 79 S.Ct. 118, 3 L.Ed.2d 109 (1958).

12. Id.; and see James v. United States, 104 U.S.App.D.C. 263, 261 F.2d 381 (1958), cert. denied, 359 U.S. 930, 79 S. Ct. 613, 3 L.Ed.2d 631 (1959).

Then I received a call from a lawyer named 'Thomas' who advised me he was entering his appearance in this case, as requested by Raymond Smith's family. I requested that he advise me that he had entered his appearance in behalf of Raymond Smith and he stated he would so advise me.

"I had some investigation to complete in the matter prior to the trial on January 3rd but, in view of the fact, he said he was going to take over, I did not undertake the investigation. Upon not hearing from him, as of yesterday, I contacted Mr. Smith's family and they indicated they had not reached an agreement with him. This was in the afternoon.

"At six o'clock, or thereafter, last night they reached me at my home and advised me to this effect: Mr. Smith indicated that he had expected to hear from Mr. Thomas; he had not heard from him and expected me to go ahead in this case. I reached Mr. Thomas and he confirmed the fact that he is evidently not going ahead in this matter.

"I would like to ask the Court to continue this matter for about ten days in order to enable me to complete the necessary investigation.

"I have spoken to Mr. Smithson and he indicated to me that he would be in trial on another case tomorrow anyhow.

\*　\*　\*　\*　\*　\*

"The Court: Trial date is February 8th."

Instead of preparing to go forward with a February 8th trial, defense counsel waited until February 7th at which time he filed a motion to suppress. Obviously, the Government was entitled to respond, and its timely opposition was filed on February 15th. Thereupon a hearing was promptly set and the appel-

lant's motion was heard and denied on February 16th.

On March 10, 1962, the appellant filed a pro se motion for his discharge, prepared without knowledge of his counsel. That motion was considered and denied on March 15, 1962. Alerted by the appellant's claim of denial of speedy trial thus for the first time asserted, the judge then put the case upon a day to day basis. It was to be tried accordingly as promptly as an opening developed with a court and counsel available, for on the 15th the few criminal courts were engaged in trial, and besides, the case was not reached.

The case was called again on the morning of March 16, 1962. Defense counsel answered ready, but it developed that a newly assigned prosecutor was engaged in a motion hearing in another case. The record before us does not show how long on March 16th, Government counsel was to be so engaged. If the trial were to have been commenced later that day, it is reasonable to assume that it would have gone over into the following week, for March 16th was a Friday. A 2-day trial was involved, as the record clearly shows.

Defense counsel in any event on March 16, 1962 announced *he would not again be available* for the next 30 days. Details as to his reasons are not before us. Perhaps because he was a court-appointed counsel who already had been in court several times at various hearings, the judge then gave him a day certain for the trial, April 16th. Trial commenced that day and ran into the 17th.

Meanwhile the appellant had filed another pro se motion.[13] He sought to vacate the order of March 15, 1962 denying his motion for discharge for want of a speedy trial. He alleged, *inter alia,* complete dissatisfaction with assigned trial counsel. The motion to vacate came on for hearing on April 13, 1962. The appellant personally presented reasons

---

13. Compare United States v. Graham, 289 F.2d 352 (7 Cir. 1961), where the accused had kept the court occupied with various proceedings.

for not wanting Attorney Canfield to represent him. The judge informed him that Mr. Canfield was a "capable and skilled lawyer" and continued:

"Now if you want him to represent you, your case will go to trial on Monday [April 16th.] If you do not want him to represent you and you want to represent yourself, he will sit there to help you. Now what do you want to do?

"Defendant Smith: In other words, what you are saying if I go to trial it has got to be with Mr. Canfield?

"The Court: You have got to go to trial with Mr. Canfield.

"Defendant Smith: Well, I don't want Mr. Canfield."

\* \* \* \* \* \*

Appellant Smith asserted there were two or three lawyers in jail.

"The Court: That is where you are getting your information. Oh, yes, well unfortunately we cannot name an attorney in jail to represent you so you go to trial Monday.

"Defendant Smith: Wait a minute, Your Honor.

"The Court: No, there is no more waiting. You are going to trial on Monday.

"Defendant Smith: This is forced upon me?

"The Court: \* \* \* You are going to trial Monday. That is all."

Monday, April 16, 1962, before Judge Walsh, appellant again pressed his objections to Attorney Canfield. He pre-sented a motion and was allowed to read it. He explained that his witnesses were in court but he asked for a continuance. He wanted another lawyer. The judge pointed out that there would, in that event, be further delay and that appellant himself had moved for a speedy trial. The judge directed that the trial proceed.

■ There can be no doubt that the Government in part had been responsible for the delay. But the tactics of the appellant himself and the hearings necessitated by his motions as well as the motion to suppress filed by his counsel, had certainly contributed substantially to the impasse. We do not assess the resolution of the issue simply in terms of "fault." [14] Rather, weighing all of the "circumstances" as we are bound to do, there is not on this record a showing [15] of such oppression or of purposeful, vexatious or arbitrary action as amounts to a deprivation of the appellant's constitutional right. He is not entitled to a judgment reversing his conviction and dismissing the indictment on the "speedy trial" ground.

### III

■■ A majority of the court is of the opinion that the trial judge erred in denying the appellant's request for an instruction on what his counsel called "entrapment." The Government's argument to the contrary, based upon the familiar entrapment pattern, is not convincing. To be sure, the defense had not here alleged resort by the officers to the usual Government stratagem [16] of send-

---

14. For that reason we do not now condemn the District Court's calendar system although it has been under critical scrutiny in certain cases. See, e. g., King v. United States, *supra* note 9; Willis v. United States, 106 U.S.App.D.C. 211, dissenting opinion at 219, 271 F.2d 477, 485 (1959); Porter v. United States, 106 U.S.App.D.C. 150, 270 F.2d 453 (1959), cert. denied, 363 U.S. 805, 80 S.Ct. 1240, 4 L.Ed.2d 1148 (1960).

15. The announcement by defense counsel on March 16, 1962 of his unavailability for 30 days came just after the case had been placed upon a "day to day" basis because of appellant's "speedy trial" motion of March 10, 1962. As noted, we regard this factor as only one of the "circumstances" rather than as an element of "fault" on the part of the defense. Compare the "circumstances" considered in Nickens v. United States, 116 U.S.App. D.C. 338, 323 F.2d 808 (1963).

16. "It is well settled that the fact that officers or employees of the government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. Artifice and strata-

ing some prospective purchaser to buy narcotics from a known or suspected seller. In such cases some form of Government activity beyond simply tendering Government-supplied money must be shown before the accused becomes entitled to an entrapment instruction. Chief Justice Hughes in *Sorrells* spoke of an accused who had been "lured * * * by repeated and persistent solicitation."[17] In *Sherman*[18] Chief Justice Warren denounced situations where "the Government *plays on the weaknesses* of an innocent party and *beguiles* him into committing crimes which he otherwise would not have attempted." (Emphasis added.) In Masciale v. United States[19] he noted that the accused had been "induced" to commit the crime. Ours is not a case where the accused lacked predisposition,[20] nor is it one where a *sale* had been induced by false pleas of urgent need by an informant buyer who thus ensnared a person otherwise "innocent."[21]

We have mentioned such cases[22] for purposes of contrast with the situation here presented. Our unusual factual setting is not unrelated to the principle underlying the defense of entrapment in this respect: it is not the duty of

officers "to incite to and create crime for the sole purpose of prosecuting and punishing it."[23] What we are talking about is whether or not a jury, guided by a charge adapted to the issues as developed at trial, could have found that the offense as here charged was "the product of the creative activity"[24] of the police. Put differently in Lopez v. United States,[25]

> "The conduct with which the defense of entrapment is concerned is the *manufacturing* of crime by law enforcement officials and their agents. Such conduct, of course, is far different from the permissible stratagems involved in the detection and prevention of crime."

It is apparent that when defense counsel asked for an instruction on "entrapment," his use of that term was a complete misnomer as applied to the issue which was developed from the evidence and argued by counsel. Undoubtedly on that account the judge was misled. Yet it seems clear that the defense sufficiently saved its point that the jury should have received guidance adapted to the issue as framed. In light of the peculiar factual situation here presented, the jury should have been told it must de-

gem may be employed to catch those engaged in criminal enterprises." Sorrells v. United States, 287 U.S. 435, 441, 53 S.Ct. 210, 212, 77 L.Ed. 413 (1932).

17. *Ibid.*; terms such as "inspired, incited, persuaded" have also been used. *Id.*, 287 U.S. at 444, 53 S.Ct. at 212, 77 L.Ed. 413.

18. Sherman v. United States, 356 U.S. 369, 376, 78 S.Ct. 819, 822, 2 L.Ed.2d 848 (1958).

19. 356 U.S. 386, 388, 78 S.Ct. 827, 2 L.Ed.2d 859 (1958). See generally, Administration of the Affirmative Trap and the Doctrine of Entrapment, 31 U.Chi. L.Rev. 137 (1963).

20. Sullivan v. United States, 95 U.S.App. D.C. 78, 219 F.2d 760 (1955).

21. The use of the term "innocent" and of its various possible connotations was considered by the court, *en banc*, in Hansford v. United States, 112 U.S.App.D.C. 359, 303 F.2d 219 (1962).

22. And see Fletcher v. United States, 111 U.S.App.D.C. 192, 295 F.2d 179 (1961), cert. denied, 368 U.S. 993, 82 S.Ct. 613, 7 L.Ed.2d 530 (1962) ; Trent v. United States, 109 U.S.App.D.C. 152, 284 F.2d 286 (1960), cert. denied, 365 U.S. 889, 81 S.Ct. 1035, 6 L.Ed.2d 199 (1961).

23. Sorrells v. United States, supra, note 16, 287 U.S. at 444, 53 S.Ct. at 213, 77 L.Ed. 413, quoting from Butts v. United States, 273 F. 35, 38 (8 Cir. 1921).

24. *Sorrells v. United States*, supra, note 16, and see Sherman v. United States, supra, note 18, 356 U.S. at 376, 78 S.Ct. at 822, 2 L.Ed.2d 848, where the Court commenting upon the technique said: "Selecting the proper time, the informer then tells the government agent" and compare with the claims here (text *infra*).

25. 373 U.S. 427, 434, 83 S.Ct. 1381, 1385, 10 L.Ed.2d 462 (1963) ; Berry v. United States, 116 U.S.App.D.C. 375, 324 F.2d 407 (1963), cert. denied, March 23, 1964, 84 S.Ct. 972.

cide whether a person or persons acting at police request "set up" the appellant, to employ the vernacular, or "planted" the capsules so that police officers could then apprehend him with contraband narcotics in his possession. In short, under an appropriate instruction, the judge should have submitted to the jury the question of whether or not this appellant was the victim of a "frame-up" in light of the background now to be developed.

The Government in its opening statement informed the jury it would seek conviction on the basis of the appellant's undisputed possession of narcotics which was prima facie evidence as to the first count and created a presumption of unlawful importation as to the second count. The opening statement for the defense contended that appellant had committed no crime. Conceding possession, counsel argued: "But we have a question, where did the narcotics come from immediately before the police arrived and how they got into his possession? There is a question of entrapment." [26]

Appellant on the stand admitted he had been an addict since 1951. He had entered a plea of guilty to possession of narcotics in 1956. He would not say that Paris then "set" him up, but Paris, his friend for many years, was with him when he was arrested on the 1956 charge. He entered a like plea for possession in 1958, "and on the second occasion" he testified, it was his sister-in-law who was the "confidential informer." [27] The appellant had "heard," he testified, that Paris had become an informer for the police, but by the Fall of 1961, Paris was giving him twelve "caps a day." He testified that the name of Paris was on the "indictment papers" of one Reginald Adams who had been convicted of narcotics violations and sentenced to serve twelve years. The appellant had been with Paris when the latter acquired the 41 capsules. Paris on October 23 gave the appellant the 41 capsules to hold "until he came back from the barber shop," for "he would be right back" and "he didn't want to take them with him." Within some forty-five minutes after Paris left, the arresting officers approached the appellant's apartment. Officer Bonaparte stopped a half block away, called the appellant on the telephone and engaged him in conversation about a September violation. He kept the appellant on the phone up to the

26. In his closing argument counsel said:

"You must go on to consider the guilt or innocence of Smith. He has said to you that he was an addict. He admitted this. He has said to you further that he did not own these capsules which he had in his possession. He had them there but they were given to him by a James E. Paris, a half hour or forty-five minutes before he went out to a barber shop.

"You further heard Smith testify that Paris was an informer for the police and you heard him mention that he had testified in the Reginald Adams case. Reginald Adams is presently doing time. There was no rebuttal of this by the Government. Therefore, you can assume it is the truth if you desire or you can reject it—either one—but you cane [sic] assume that James Paris was an informer. If you find that he was, then you have another question? Did he set Raymond up for the police? Did he give him forty-one caps on this day? And then leave and call the police and say he is

there? And he has got the stuff? Five or six officers come over within that period of time, two in the front, and three or four in the back while Bonaparte is down at the corner holding Smith on the phone?

"It all seems to fall into place. Excuse me for taking so much time but I do not want to miss anything because I do not have a chance to come back to you."

The prosecutor in his closing, argued: "The only thing I have to prove is that he had [the capsules] on his person."

After the court's charge, defense counsel at the bench was critical of the impact of the instructions as to possession without an instruction as to the defense of entrapment. The judge simply noted an exception.

27. The unidentified informant upon whose affidavit the October 19, 1961 search warrant had been issued was female, Officer Bonaparte said. Practically every time he saw her she gave him some information, he testified.

time the appellant informed him he saw Officers Hood and Hutcherson approaching the apartment. Officer Bonaparte then came up and joined the others.

Through Bonaparte as a witness, both on cross examination and in rebuttal, further background was developed to which we but briefly refer. The transcript shows that Bonaparte in September, 1961 had arrested the appellant on a narcotics charge.[28] Thereafter the officer "had been in contact with him on different occasions." He developed a "working agreement" with the appellant so that the latter would help him in "other narcotics cases." The appellant undertook to supply information to Bonaparte. At some point, appellant told Bonaparte that people on the street —drug peddlers—began to think the appellant was "wrong." "They" thought Bonaparte had released him after the September arrest because he had turned informer, Paris reported to the appellant. Bonaparte, on the other hand, heard from some informant that the appellant was violating the narcotics laws. He testified that prior to the October 23rd arrest, he went to the appellant's home to advise him "that since he was giving us information, that it didn't give him a license or a right to sell drugs." Although when questioned on the point he asserted his belief in the reliability of his informant,[29] the officer did not then arrest the appellant, he explained, because "I didn't have any sale or anything else on Smith at that time." The officer *had no narcotics as evidence,* answers to the prosecutor's questions es-

tablished.[30] Steps were next taken leading to the action by the officers on October 23, 1961 when the appellant handed over to the officers the 41 capsules which forty-five minutes earlier, as he testified, had been entrusted to him by Paris.

Whether the episode was "the product of the creative activity of the police" or this was a case of the *"manufacturing* of crime by law enforcement officials and their agents,"[31] such was the background for the defense request for an instruction on "entrapment." Had there been an instruction properly adapted to the issues as framed, the jury might still have rejected the defense. It might have been concluded that this appellant was totally unworthy of credence, but in our view the evidence presented a jury question. In denying the request, the trial court erred.

Reversed.

WRIGHT, Circuit Judge, with whom Chief Judge BAZELON concurs, concurring and dissenting:

I concur in Part I of the court's opinion. Understanding the *dicta* contained in the first paragraph of Part III as leaving untouched our carefully considered decision in Hansford v. United States, 112 U.S.App.D.C. 359, 364, 303 F.2d 219, 224 (1962) (*en banc,* two judges dissenting), I concur in the reversal for failure to give a suitable instruction in the "unusual factual setting" here presented. I respectfully dis-

28. The prosecutor asked the officer whether that arrest "was a police bribe or an informant bribe." A. "That was also an informant bribe." [We do not profess to understand such jargon.] Defense counsel inquired of the officer as to "what happened in connection with the September arrest"; the prosecutor objected and promised a motion for a mistrial. The objection then was sustained.

29. The source of his information was not disclosed. Paris did not become a witness.

30. The prosecutor: "Q. And I take it you had nobody, so to speak, nor no narcotics to show, so that you could even say that it were [*sic*] narcotics? Is that correct? A. No sir." Prosecutor: "That is the Government's case in rebuttal, Your Honor."

31. Compare the doings of Kalchinian in Sherman v. United States, supra, 356 U.S. at 373, 78 S.Ct. at 821, 2 L.Ed.2d 848. "Finally, assured of a catch, Kalchinian informed the authorities so that they could close the net." And see cases cited in notes 24 and 25, *supra.*

sent from Part II which holds that the appellant was not denied his Sixth Amendment right to a speedy trial.

Unlike Continental concepts of criminal justice, under our law a man charged with crime is presumed innocent. But, under today's decision, an innocent man may be held in jail for almost six months awaiting his trial. Under this ruling, for the first six months after accusation, the presumption of innocence—and the right to a speedy trial—mean very little to a defendant unable to make bond.

The Government argues that, considering calendar congestion and related evils, six months really is not an unreasonable time to spend in jail awaiting trial. That appraisal, of course, depends on whose time is being spent. Able assigned counsel for the accused on one occasion spent 30 minutes in jail interviewing his client. During oral argument he assured us that, in jail, 30 minutes seemed a long time. I doubt that anyone would gainsay his statement.

Some may think the Sixth Amendment "right to a speedy and public trial" is a legal term of art which does not mean what it seems to say. I find no basis in either the terms or the history of the Sixth Amendment for any such conclusion. There is no indication that the Framers of the Amendment used the word "speedy" in other than its dictionary meaning. Webster's Third New International Dictionary, Unabridged (1961), defines "speedy" as: "rapid in motion: going or able to go quickly: swift." Perhaps the trial below, which consumed only a few hours, meets this definition of "speedy," but the six-month wait in jail hardly does. And it is not to the duration of the trial but to the delay and detention before trial that the Sixth Amendment speaks—the detention of innocent persons accused of crime.

Officials of our legal system, in appraising the reasonableness of pre-trial detention, sometimes consciously or unconsciously assume that, in sentencing, the judge will consider, or has considered, the time spent awaiting trial. The difficulty with this assumption is that it disregards the presumption of innocence, as well as the fact that not all persons accused of crime are ultimately found guilty. For example, the statistics furnished by the Administrative Office of the United States Courts tell us that 27.6 per cent of the defendants tried in the District Court here are found not guilty. The 27.6 per cent is based on July 1, 1962 to June 30, 1963 figures. The actual count is 288 convictions and 110 acquittals.

In the twentieth century, with its automation, its computers, and its accent on action, everything seems to be getting speedier except criminal justice. And, undeniably, some of that lack of speed results in great injustice. In my judgment, today's decision is not designed to improve the situation. In the past, this court—over strong dissent—has affirmed convictions where there had been substantial delay in bringing the cases to trial. King v. United States, 105 U.S. App.D.C. 193, 265 F.2d 567 (1959) (5–4), cert. denied, 359 U.S. 998, 79 S.Ct. 1124, 3 L.Ed.2d 986 (1959); Porter v. United States, 106 U.S.App.D.C. 150, 270 F.2d 453 (1959) (2–1), cert. denied, 363 U.S. 805, 80 S.Ct. 1240, 4 L.Ed.2d 1148 (1960). It was hoped that those cases—both the majority opinions and Chief Judge Bazelon's dissents—would serve as warning, and have the effect of discouraging delay in subsequent cases. These hopes have not been fulfilled. Then, as of July 1, 1959, there were 17 pending, untried cases which had been awaiting trial six months or longer in our District Court; as of July 1, 1963, there were 66 such cases; as of January 1, 1964, there were 70 such cases. I note also that of these 70, 25 cases have been awaiting trial for more than a year —and 9 of these 25 cases are waiting in jail.

For these reasons and the reasons stated by Senior Judge Edgerton in his panel opinion in this case, I respectfully dis-

sent from Part II of the court's opinion. Judge Edgerton's opinion follows.

"EDGERTON, *Senior Circuit Judge:* On October 24, 1961 appellant was arrested on narcotics charges. He did not make bail of $2500 and was confined in jail to await trial. He was indicted on two counts on November 13, 1961, and counsel was appointed. He was arraigned and pleaded not guilty on November 17, 1961. Trial was set for January 3, 1962, 47 days after indictment, but a succession of continuances delayed trial until April 16, 1962, five months after indictment. Appellant was convicted on April 17, 1962, and sentenced to concurrent terms of five and ten years on June 1, 1962. On December 31, 1962, by order of this court entered November 21, 1962, he was admitted to bail of $1500 pending appeal. He had been in the District of Columbia jail a year and two months, including nearly six months awaiting trial.

"There were six continuances:

"1. For 15 days, until January 18, 1962; at the government's request because a narcotics agent was on leave.

"2. For 3 weeks, until February 8, 1962; because the prosecutor would be engaged in another case on January 18.[1]

"1. The January 17 'jacket' entry, 'Contd. to 2–8–62 on mo. of deft. for more time to prepare', is erroneous. On January 17, appellant's assigned counsel (1) asked for a continuance of 'about ten days' (not 3 weeks) because appellant had planned to retain other counsel and this had delayed assigned counsel's preparation, and (2) informed the court that the prosecutor 'would be in trial on another case tomorrow anyhow.' As the transcript shows, the court made it clear that no part of the continuance of 3 weeks which the court ordered was due to defense counsel's request for a continuance of about ten days: 'Let the record show * * * there will be no continuance granted by reason of the appearance of some other counsel.'

"3. For 25 days, until March 5, 1962; because the prosecutor was engaged in another trial on February 8. The court ordered that appellant's case be given priority and a day certain, but it does not appear that this was done.

"4. For ten days, until March 15, 1962; at the government's request, because a government witness was ill.

"On March 10, and again on March 15, the defendant moved unsuccessfully for discharge for want of a speedy trial.

"5. For one day, until March 16, 1962. The March 15 'case card' entry reads: 'carried over to 3/16/62 criminal courts engaged in trial & case not reached'.

"6. For one month, until April 16, 1962. The March 16 'case card' entry reads: 'Cont'd. to 4/16/62 Mr. McLaughlin [an Assistant United States Attorney] engaged in motion before Judge Youngdahl and he had taken this case for Mr. Smithson [the Assistant United States Attorney previously assigned to the case] and Mr. Canfield [defense counsel] is not available till 4/16/62'. The record does not show why the government, apparently on the day set for trial, reassigned the case to an attorney who was not available to try it. Mr. Smithson, not Mr. McLaughlin, finally tried it.

"The continuance from March 16, 1962, was sought by the Government and granted by the court in spite of the fact that on March 15, 1962, the court had denied two motions, filed by the defendant pro se, for discharge for want of a speedy trial. When the case came on for trial on April 16, 1962, motion for discharge for want of a speedy trial, filed by defense counsel, was also denied. At that time appellant had been in jail nearly six months and under indictment five.

"The prosecution caused five of the six continuances that delayed the trial. The five aggregated 102 days. The only other continuance (numbered 5 above), because the criminal courts were engaged, was for only one day. The defense caused no continuance. Defense counsel was ready on March 15, and again on March 16, although after March

16 he was not available again until April 16.

"The Sixth Amendment of the Constitution provides:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.

"The emphatic words 'shall enjoy' are used nowhere else in the Constitution. Moreover, the order in which rights are enumerated in this Amendment emphasizes 'the right to a speedy and public trial'. Before a case is tried, the 'district wherein the crime shall have been committed' has been 'ascertained'; the accused has been 'informed of the nature and cause of the accusation'; 'the witnesses against him' have been summoned; 'process for obtaining witnesses in his favor' has been issued; and 'the Assistance of Counsel for his defense' has been secured. If the framers had been content to follow a chronological order, they would have put last 'the right to a speedy and public trial'. They disregarded chronological order and put this right first, immediately after 'the accused shall enjoy'.

"We do not suggest that constitutional rights may be whittled away unless they are emphatically expressed. We do urge that the right to a speedy trial should be fully respected.

"The right 'is necessarily relative. It is consistent with delays and depends upon circumstances.'[2] The responsibility of the prosecution for the delay in the present case is only one of the circumstances which, taken together, in our opinion make it impossible to reconcile this delay with appellant's right to a speedy trial.

"Because he could not buy a $2500 bail bond the appellant was imprisoned, despite the legal presumption of innocence, while he waited to be tried. This means that for nearly six months he was imprisoned not because he was guilty but because he was poor. An accused person may not be denied counsel, or the right to take an appeal that is not plainly frivolous, because of his poverty. We think the same general principle covers this case. In our opinion the right to a speedy trial includes, in the circumstances of this case, a right not to be kept in jail for months without trial for the convenience of the prosecution. We think this right may not be denied because the accused is poor. We need not consider how we should decide the case if the delay caused by the prosecution had been less substantial,[3] if continuances for substantial periods had been granted at the request of the defense or caused by the unavailability of judges, or if the defendant had failed to make repeated motions for discharge for want of a speedy trial.

"A majority of this court in banc held that, in the circumstances of the King case, trial of an imprisoned defendant six months after he was indicted and nearly five months after the date originally set for trial was not too late. But the court intimated that it would probably have reached a different conclusion in circumstances like those now before us. It said: 'First of all, the prosecutor had no part in any of the delays. He never requested or occasioned a continuance.

"2. Beavers v. Haubert, 198 U.S. 77, 87 [25 S.Ct. 573, 49 L.Ed. 950] (1905).

"3. In Porter v. United States, 106 U.S. App.D.C. 150, 270 F.2d 453 (1959), cert. denied, 363 U.S. 805 [80 S.Ct. 1240, 4 L.Ed.2d 1148] (1960), the prosecution was responsible for continuances which aggregated 46 days (not 102 as here), but the defense was responsible for a continuance of 21 days and the calendar system for one of 24 days.

\* \* \* In the second place, of the seven continuances three were on King's behalf; of the 140 days which elapsed, some 60 days of delay were requested or occasioned by King himself.[4] \* \* \*

"4. The court continued: 'In the third place, King does not allege any prejudice by reason of the delay.'

Cases such as United States v. Provoo, Taylor v. United States, United States v. McWilliams, and United States v. Chase, cited by appellant, are not applicable here, because the delays involved in those cases were attributable to the prosecution.' King v. United States, 105 U.S. App.D.C. 193, 194, 195, 265 F.2d 567, 568, 569 (1959), cert. denied, 359 U.S. 998 [79 S.Ct. 1124, 3 L.Ed.2d 986] (1959). This implies that if the delays involved in the *King* case had been attributable to the prosecution they would have raised a serious constitutional question. Since the delays in the present case are attributable to the prosecution and in other respects are similar to those in *King*, that question is before us.

"We answer the constitutional question in favor of the appellant and do not reach his other contentions. Because his right to a speedy trial was denied, the judgment of conviction must be vacated and the indictment dismissed."

FAHY, Circuit Judge (dissenting).

The opinion of the division of the court which decided this case August 15, 1963, reversing because of the view that appellant had been denied his right to a speedy trial, and directing the dismissal of the indictment, was limited to the facts of the case and laid down no general principle applicable to other cases involving the right to a speedy trial. For this reason I think the granting by the court of the petition for rehearing en banc was improvident. I would therefore vacate the order granting rehearing en banc so that the opinion of the division, rendered August 15, 1963, would be reinstated with judgment in accord therewith.