**The UNITED STATES of America**
v.
**Frank W. OWENS.**
Crim. No. 988–63.

United States District Court
District of Columbia.
March 24, 1964.

John H. Treanor, Jr., Asst. U. S. Atty., Washington, D. C., for plaintiff.

John A. Shorter, Jr., Washington, D. C., for defendant.

YOUNGDAHL, District Judge.

Defendant in this criminal action is charged with a violation of two provisions of the United States Code, 26 U.S.C. §§ 4705(a), 4704(a), in connection with the sale of narcotic drugs on May 26, 1963. Although defendant concedes he sold the drugs to the undercover agent of the Federal Bureau of Narcotics, he contends that the evidence in the Government's case shows as a matter of law that he was entrapped by said agent into securing the illicit drugs. Defendant has moved for judgment of acquittal at the close of the Government's case.

The issue before the Court at this stage of the trial, therefore, is whether the evidence adduced by the prosecution presents an issue of fact for the jury on the issue of entrapment, as the Government contends, or whether the evidence viewed in a light most favorable to the prosecution requires the Court to enter judgment of acquittal on the ground that entrapment has been established as a matter of law, as defendant contends.

The Government's own evidence establishes the following facts:

In January, 1963, William H. Turnbou, an undercover agent of the Federal Bureau of Narcotics, came to Washington to undertake an undercover investigation. Turnbou was put in touch with one Gladys Irby, a known user of cocaine who was under indictment for violation of the narcotics laws. About the middle of January, 1963, while in a bar at Seventh and T Streets, N. W., in the District of Columbia, said Irby introduced Turnbou to the defendant, stating that Turnbou "was a friend of her nephew's," that he "was all right," and that she "would appreciate" his showing Turnbou around. Agent Turnbou testified that the expression "all right" in the narcotics jargon meant that he could be trusted, that he was "a regular fellow," and would generally go along with the program. Agent Turnbou further testified that the expression "all right" meant that "there was no need to have any apprehension of his informing or doing anything to jeopardize anybody." Irby introduced Turnbou into a group of cocaine users, and Turnbou began frequenting certain bars, restaurants, and other places where members of the narcotics group would be present. In furtherance of his plan to become accepted by the group, Turnbou for five months—from January until late in May, 1963—attended fifty or sixty "after-hours parties" at which cocaine was freely used, contrary to law, liquor was sold illegally, and illegal gambling—including a craps table, with a "take" for the "house"—took place. These "parties" began about 2:00 a. m., and lasted until approximately 8:00 a. m. or 10:00 a. m. At any one time, there would be twenty to thirty people present, but people would come and go throughout the night. It is conceded that the activities at these "parties" violated local gambling, liquor, and narcotics laws.

Turnbou himself participated actively in these parties. On several occasions, he feigned the use of cocaine, by taking cocaine powder into the bathroom, exchanging it with a form of sugar with which his superiors at the Narcotics Bureau had provided him, and then—in the presence of others—taking what appeared to be narcotics. He also bought liquor where it was illegally sold at the parties, both for himself and sometimes also for the informer Irby; he was reimbursed for the cost of this liquor from funds provided by the Narcotics Bureau. He also participated in the gambling activities, but had to pay for this out of his own pocket, in accord with an established policy of the Narcotics Bureau. The Narcotics agents were unable to explain to the Court why they were reimbursed for liquor illegally purchased but were not so reimbursed for the agent's illegal gambling activities authorized by the policy of the Bureau. Although the stakes were sometime as high as one hundred dollars or more, he generally would gamble only up to about ten dollars' worth in an evening. He undertook these activities in order to establish rapport with the group.

The defendant was present at about twenty or twenty-five of the "after-hours parties" attended by agent Turnbou; Turnbou and the defendant went to the "parties" together on a number of occasions. Most of the people present were taking narcotics. Agent Turnbou come to know some eight or ten of these people as sellers, and there was at least one seller present at each "party." He saw the defendant talking with one or another of these sellers at each "party" attended by defendant. Turnbou knew that the defendant was a "user" of cocaine, and in fact saw him use it at these "parties" frequently. Agent Turnbou knew that the informer Irby and the defendant were friends, and that they had lived together for a period. Turnbou saw the defendant frequently in the bars in a certain area of the District of Columbia, where these cocaine users would congregate. He went with the defendant to these bars numerous times.

On March 7, 1963, agent Turnbou called the defendant on the telephone, and told him that he wanted some cocaine. Defendant replied that Turnbou should come to a certain address. The agent

went, where he found the defendant and another individual named Murphy (who in fact was already known to the agent). The defendant introduced Turnbou to Murphy, saying, "This is Henry, a friend of mine." A conversation then followed between Murphy and the defendant which the agent did not hear. Defendant then told Turnbou to go to 810 Randolph Street, N. W., and to wait there. Turnbou and Murphy then went to that address and waited. After waiting for some time, Murphy called the defendant on the telephone to find out if the defendant was coming or not. The defendant never came, but the agent made a "buy" from Murphy that day.

On May 25, 1963, in the evening, the agent tried to make a buy at 1810 Lawrence Street, N. E., from one Cardell, but Cardell refused to sell him any cocaine, and Turnbou left. This was the location of a number of the "parties" attended by Turnbou. After midnight, in the early morning hours of May 26, the agent called the defendant on the telephone at a "carry-out" shop frequented by the group of cocaine users. Turnbou told the defendant that he wanted to get a "bag" of cocaine. The defendant asked where he was and then said he would come by. At about 4:00 a. m., the defendant arrived by car with the informer Irby and two other people. Turnbou came out and entered the car, which then was driven to 1810 Lawrence Street, N. E. Turnbou then gave the defendant fifty dollars of funds advanced by the Narcotics Bureau, and the defendant went inside the premises at 1810 Lawrence Street, N. E. He thereafter emerged, and handed Turnbou something that looked like narcotics wrapped in a cellophane wrapper from a pack of cigarettes. The contents turned out to be cocaine, which agent Turnbou turned over to his superiors at the Narcotics Bureau.

As a result of Turnbou's investigation, five prosecutions were initiated, including two from 1810 Lawrence Street, N. E., one of which was the defendant. Although one of the main purposes of the investigation was to discover and make a case against one of the chief suppliers of cocaine, no such case was initiated as a result of the investigation. And Agent Wurms, Turnbou's superior, conceded on the witness stand that during said investigation from January to May as previously described, the Bureau's effort to locate the source of supply was unsuccessful. Informer Irby, who was paid a maximum of nine dollars per day by the Narcotics Bureau, was also employed and paid by those in charge of the "after-hours parties," which fact was known to the Bureau. The pending case against her was *nolle prossed* by the Government on the recommendation of the Narcotics Bureau in return for her services. Although Irby was present in the witness room, the Government did not call her to testify.

As of May 26, 1963, agent Turnbou knew of no previous narcotics sale made by the defendant; so far as the record indicates, this was his first.

In these circumstances, as revealed by the evidence, this Court must decide whether entrapment exists in this case as a matter of law.

It is recognized, of course, that the use of informers and undercover agents to secure evidence in narcotics cases is necessary to the efficient enforcement of the narcotics laws and has been sanctioned by the courts. E. g., *Johnson v. United States*, 317 F.2d 127, 130 (D.C.Cir. 1963). However, the use of informers and undercover agents is circumscribed by the law on entrapment. Entrapment exists only when Government agents induce and originate the criminal intent of the defendant, and there is not entrapment where criminal intent is already present and the Government agents merely afford the opportunity for commission of the crime. If an officer of the law has reason to believe that a law is being violated, he may proceed to ascertain whether those who are thought to be doing so are actually violating the law. The officers of the Government, however, must act in good faith and in the honest belief that the defendant is engaged in the un-

lawful business of which the offense charged in the indictment is a part, and the purpose of entrapment must not be to induce a person to commit a crime, but to secure evidence upon which a guilty man can be brought to justice. The factual issue is whether the Government agent convinced an otherwise unwilling person to commit a criminal act or whether defendant was already predisposed to commit the act. Entrapment arises only when the criminal conduct was the product of the creative activities of law enforcement officials. A person is not entrapped when an officer merely presents him with the opportunity to commit an offense in order to detect criminality rather than to instigate or create criminality. Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932); Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958); Hansford v. United States, 112 U.S.App. D.C. 359, 303 F.2d 219 (1962); Smith v. United States, 331 F.2d 784 (D.C.Cir. 1964).

■ Generally it is a question of fact for the jury to determine whether or not the Government has proved beyond a reasonable doubt that there was no entrapment.[1] But exceptional circumstances arise when entrapment is established as a matter of law, as the Supreme Court unanimously found in the Sherman case, supra. There, the Court held that it was "patently clear" that the Government agent had induced the violation by an addict who was trying to overcome his habit, 356 U.S. at 373, 78 S.Ct. at 821, 2 L.Ed.2d 848 and there was no evidence except for two prior convictions, both remote in time, that defendant was predisposed to commit the offense. 356 U.S. at 375–376, 78 S.Ct. at 822, 2 L.Ed.2d 848.

■ On the basis of the testimony in the present case, it is also "patently clear" to this Court that the sale made by defendant on May 26, 1963 was induced by a Government undercover agent, acting with the informer Irby, and that

there is no evidence to show that defendant was predisposed to commit the offense. Agent Turnbou had seen no prior sale by defendant, and he knew of no such sale. On the only previous request by the agent for narcotics, the defendant had not shown up at the designated location. Defendant had merely been seen in the company of other users and some sellers—but such association is not sufficient to indicate a *predisposition to sell* narcotics, as distinct from a predisposition to use narcotics. The fact that defendant was observed talking to sellers is reasonably explained as an expression of the defendant's need to obtain narcotics for his own use. There is no evidence that defendant made any profit from the sale to the agent. Rather, the evidence indicates that the agent had posed as a fellow user; that he gradually gained defendant's confidence over a five-month period; that he asked defendant for narcotics for his own use; that he used funds advanced from the Narcotics Bureau; and that his action was clearly calculated to persuade an otherwise unwilling defendant to do something he had not done in the past—namely, to sell narcotics.

Aside from the above considerations, which alone would lead this Court to hold that no reasonable juror could return a verdict of guilty, thereby requiring this Court to set aside the jury's verdict in the event of a conviction, there is an added factor in this case which deserves comment, and which places the above discussion in a larger context. It is shocking to this Court that in order to obtain evidence of a sale of narcotics, the undercover agent, with the approval of his superior officers, participated with others at the "after-hours parties" in open and conceded violation of the local laws against gambling, the illegal sale of liquor, and the illegal possession and use of cocaine. It seems unnecessary to state that we have arrived at a low level of appropriate law enforcement when in order to secure evidence of narcotics violations Federal Narcotics agents them-

---

1. On the burden of proof, see Johnson v. United States, 317 F.2d 127, 129 n. 2 (1963).

selves have to violate the law and thus be *in particeps criminis* with the very criminals they are trying to detect. True it is that the narcotics traffic is vicious and degrading and brings the downfall of many of our citizens to a pitiful state of existence. Likewise do we agree with the contention that every effort should be made by law enforcement officials to bring to the bar of justice those who are participating in this illegal traffic. Moreover, the Court realizes that informers, who are not the highest type of citizens, must be used in securing evidence in narcotics cases. But the main thrust of enforcement should be to get at the source of supply and those who are engaged in the traffic for a profit. This is not always easy to accomplish. Nevertheless, it does not alter the fact that the addict who is so weak as to be unable to resist the temptation to use drugs and who secures funds in other illegal ways to finance his own habit should not be encouraged and tempted by law enforcement officials to intensify his habit by methods of inducement and persuasion such as occurred in the present case. Such inducement merely compounds the serious implications of drug addiction.

█ It is in relation to this kind of individual—the user—that we must evaluate the appropriateness of the methods used by the undercover agent. For five months, three kinds of illicit activity were carried on with the knowledge of Federal Narcotics officials—the illegal sale of liquor, illegal gambling, and the illegal use of narcotics. There are evils implicit in any governmental official knowing of such activities without taking speedy action—evils which can erode the very law enforcement agencies themselves. In the present case, the undercover agent has been completely candid with this Court; his honesty, integrity, and frankness are a credit to himself and to the Narcotics Bureau. Nevertheless, the risks inherent in any law enforcement techniques which condone illegal activities must always be a foremost concern of the courts, and when a law enforcement agency has exceeded the bounds of propriety, it is the duty of the courts to say so. Justice Roberts wrote, concurring in Sorrells v. United States, supra:

> "The doctrine [of entrapment] rests * * * on a fundamental rule of public policy. The protection of its own functions and the preservation of the purity of its own temple belongs only to the court. It is the province of the court and of the court alone to protect itself and the government from such prostitution of the criminal law. The violation of the principles of justice by the entrapment of the unwary into crime should be dealt with by the court no matter by whom or at what stage of the proceedings the facts are brought to its attention." 287 U.S. at 457, 53 S.Ct. at 218, 77 L.Ed. 413.

And Justice Frankfurter said, concurring in Sherman v. United States, supra:

> "No matter what the defendant's past record and present inclinations to criminality, or the depths to which he has sunk in the estimation of society, certain police conduct to ensnare him into further crime is not to be tolerated by an advanced society." 356 U.S. at 382–383, 78 S.Ct. at 826, 2 L.Ed.2d 848.

These principles, embodied in the law of entrapment, are designed as much to protect the integrity of our law enforcement agencies as they are to protect the purity of the courts and the rights of individual defendants. It is a threat to the integrity of our law enforcement machinery when Federal Narcotics agents, in order to secure convictions of narcotics law violators, violate other laws to achieve their purpose.

█ In view of the undisputed evidence presented by the prosecution, this Court would be remiss in its duty if it did not grant judgment of acquittal on the ground that as a matter of law the defendant was entrapped.

It is so ordered.