**Eddie M. HARRISON, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**Orson G. WHITE, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**Nos. 20280, 20281.**

United States Court of Appeals District of Columbia Circuit.

Argued Nov. 16, 1966.

Decided May 18, 1967.

Rehearing Denied En Banc Aug. 1, 1967.

---

Mr. Alfred V. J. Prather, Washington, D. C. (appointed by this court), for appellant in No. 20,280.

Mr. George J. Thomas, Washington, D. C. (appointed by this court), for appellant in No. 20,281.

Mr. Robert Kenly Webster, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., and Frank Q. Nebeker, Asst. U. S. Atty., were on the brief, for appellee.

Before BASTIAN, Senior Circuit Judge, and McGOWAN and ROBINSON, Circuit Judges.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

Appellants, Eddie M. Harrison and Orson G. White, and a co-defendant, Joseph R. Sampson, were convicted in October, 1960, of the felony-murder of George H. "Cider" Brown.[1]  Death sentences,

---

1. "Whoever, being of sound memory and discretion, kills another purposely, either of deliberate and premeditated malice or by means of poison, or in perpetrating or attempting to perpetrate any offense punishable by imprisonment in the penitentiary, or without purpose so to do kills another in perpetrating or in attempting to perpetrate any arson, as defined in section 22–401 or 22–402, rape, mayhem, robbery or kidnapping, or in perpetrating or attempting to perpetrate any house-

then mandatory, were imposed.[2] The case submitted by the Government, and accepted by the jury, was that Brown was killed by a blast from Harrison's shotgun in the course of an attempt to perpetrate a robbery espoused by the trio. While an appeal was pending, it came to light that one Daniel Jackson Oliver Wendel Holmes Morgan, a layman impersonating a member of the District of Columbia bar,[3] had represented White and Sampson throughout the trial and Harrison during its post-verdict stages,[4] a discovery that led to a new trial.[5] In April, 1963, appellants and Sampson were again found guilty, the jury recommending life imprisonment for each, to which they were sentenced.[6] These convictions

were reversed because statements they had made to police officers had been improperly admitted.[7]

The third trial, in May, 1966, from which this appeal emanated, was atypical. Since some of the witnesses participating earlier had either died or could not be located, the Government's presentation consisted largely in a reading into evidence of testimony given at the second trial by appellants and the absent witnesses. At the close of its case in chief, the trial judge directed a judgment of acquittal in Sampson's favor but denied similar motions by appellants. Offering no evidence in defense, appellants once more were convicted and, on recommen-

dation of the jury, were sentenced to life imprisonment.

As grounds for reversal appellants urge (a) that they were denied a speedy trial, (b) that the admission of their second-trial testimony was improper, and (c) that there was insufficient evidence that a robbery was in progress when the homicide occurred to convict them of felony-murder. We discuss but reject these contentions, and affirm as to Harrison. The record, however, reveals serious error in the admission at this trial of portions of the testimony White gave at the first trial, and this requires reversal of his conviction.

## I

The contention that appellants' Sixth Amendment right to a speedy trial[8] has not been respected is predicated broadly upon the six-year lapse between the homicide and the third trial, but for this purpose we cannot treat litigation spans in a vacuum. "There is no touchstone of time which sets a fixed maximum period that automatically requires application of the Sixth Amendment and dismissal of the indictment."[9] Rather, "[t]he right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances. It secures rights to a defendant. It does not preclude the rights of public

breaking while armed with or using a dangerous weapon, is guilty of murder in the first degree." D.C.Code § 22–2401 (1961 ed.). Another count, charging Brown's premeditated murder, was dismissed on the Government's motion during the trial.

2. D.C.Code § 22–2404 (1961 ed.).

3. See Morgan v. United States, 114 U.S. App.D.C. 13, 309 F.2d 234 (1962), cert. denied 373 U.S. 917, 83 S.Ct. 1306, 10 L.Ed.2d 416 (1963).

4. Harrison's trial counsel died before the hearing and determination of his post-verdict motions and Morgan represented him in the ensuing District Court proceedings.

5. We first remanded in order that each of the three appellants might move for a new

trial. After they disaffirmed motions therefor filed by new counsel, we reinstated the appeal and *sua sponte* vacated the convictions with direction that a new trial be awarded. See Harrison v. United States, 123 U.S.App.D.C. 230, 232–233, 359 F.2d 214, 216–217 (1965).

6. D.C. Code § 22–2404 was amended in 1962 to authorize these sentences.

7. See *infra*, note 15.

8. "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial * * *" U.S.Const. amend. VI.

9. Hedgepeth v. United States, 124 U.S. App.D.C. 291, 364 F.2d 684, 687 (1966).

justice."[10] So in determining whether the delay complained of assumes constitutional proportions, we examine the circumstances[11] closely to ascertain whether it was "arbitrary, purposeful, oppressive or vexatious."[12]

On the second appeal, appellants pressed a similar claim with respect to the time the case had consumed to that point. We unanimously rejected it for the reasons then expressed and repeated below.[13] Viewing additionally the period since ensuing, we find no reason to now conclude differently.

The present argument focuses upon the interval of approximately two years during which the second appeal was pending. Here undoubtedly is "a spot where the ideal crashes head-on with the practical,"[14] and appellants' position reflects but scant recognition of the exigencies of appellate review in abnormal cases. That appeal was first argued in December, 1963, before a panel of the court. One of the several difficult questions involved, we decided, was so important as to require determination by the entire court. In June, 1965, the cases were reargued and in December of that year the convictions were reversed. The combinational effect of the panel and *en banc* decisions was to bar from subsequent use all incriminating extrajudicial statements made by appellants.[15]

The time necessarily consumed in unraveling complex issues whose ultimate

---

10. Beavers v. Haubert, 198 U.S. 77, 87, 49 L.Ed. 950 (1905).

11. "Whether delay in completing a prosecution * * * amounts to an unconstitutional deprivation of rights depends upon the circumstances." Pollard v. United States, 352 U.S. 354, 361, 77 S.Ct. 481, 486, 1 L.Ed.2d 393 (1957). See also United States v. Ewell, 383 U.S. 116, 120, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966); Hedgepeth v. United States, supra note 9, 364 F.2d at 687; Smith v. United States, 118 U.S.App.D.C. 38, 41, 331 F.2d 784, 787 (*en banc* 1964).

12. Smith v. United States, *supra* note 11, 118 U.S.App.D.C. at 41, 331 F.2d at 787. See also Pollard v. United States, *supra* note 11, 352 U.S. at 361–362, 77 S.Ct. 481.

13. "Following their first appeal, they could have been tried in the Fall of 1961 if they had followed this court's original suggestion that they move for a new trial. They refused to do so, and as noted, *supra*, this court, *sua sponte*, was obliged to reinstate the appeals and, on June 12, 1962, to enter an order vacating the original judgments of conviction. That order was filed in the District Court July 3, 1962. The District Court then assigned the case for trial on October 17, 1962. By that date there had been hearings on motions of various court-appointed counsel for leave to withdraw; Harrison had no attorney; Attorney David, appointed October 30, 1962, thereafter sought a continuance contending that he had no transcript of the first trial; Harrison then moved that Attorney David be discharged; motions to dismiss on double jeopardy grounds had been filed and argued; in short, on one basis or other, the District Court was occupied with a series of defense motions, some purportedly of substance, some procedural, but all contributing to delay.
"The unique problems stemming in the first place from Sampson's and White's having engaged the impostor Morgan gave rise to the several dilatory moves. No prejudice in fact was shown. Nor were the 'circumstances' such as to deprive the appellants of constitutional rights." Harrison v. United States, *supra* note 5, 123 U.S.App.D.C. at 233, 359 F.2d at 217.

14. King v. United States, 105 U.S.App.D.C. 193, 195, 265 F.2d 567, 569 (*en banc*), cert. denied 359 U.S. 998, 79 S.Ct. 1124, 3 L.Ed.2d 986 (1959).

15. Harrison v. United States, *supra* note 5. The panel held that written statements taken from the three defendants by police and jail classification officers were banned by Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), and Killough v. United States, 114 U.S.App.D.C. 305, 315 F.2d 241 (*en banc* 1962), 119 U.S.App.D.C. 10, 336 F.2d 929 (1964). The subject of *en banc* consideration was the admissibility of oral statements Harrison made a few days after his eighteenth birthday but a week prior to waiver to the District Court of jurisdiction over the affair, which occurred while he was a juvenile. The panel held that they had properly been received in evidence but a majority of the full court ruled otherwise on the basis of Harling v. United States, 111 U.S.App.D.C. 174, 295 F.2d 161 (*en banc* 1961).

resolution vindicates the rights of the accused can hardly be said to constitute purposeful or oppressive delay. We are accustomed to careful study of the questions presented to us, particularly where human life or liberty is at stake, and surely this case has tolerated no deviation. "[T]he essential ingredient is orderly expedition and not mere speed"; [16] indeed, "[a] requirement of unreasonable speed would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself." [17] One has but to examine the comprehensive opinions the second appeal brought forth to appreciate the court's task and foresee the risk that unwarranted haste might have worked to appellants' disadvantage. And there is no hint that any subsequent phase of this case radiates any constitutional implication.

Nor do we deem it likely or reasonably possible that appellants could have been prejudiced by the delay. [18] The only concrete suggestion in that direction is that the absence of some of the Government's witnesses and the resulting need to read their prior testimony to the jury precluded additional cross-examination. But appellants had, and utilized, the opportunity to question those witnesses fully during the second trial, and at the third trial they were free to present to the jury the prior cross-examinations but elected not to do so. We are unable to identify any harm to appellants consequent upon the passage of time.

## II

At the second trial, after the Government had introduced the post-arrest statements later outlawed on the second appeal, [19] appellants themselves took the witness stand to relate events calculated to establish their innocence. The Government, as part of its case in chief at the third trial, introduced portions of the testimony appellants gave at the second trial. To this appellants register objection, asserting that they testified at the second trial only because the statements had been received in evidence thereat.

■■ The Government's submissions from appellants' second-trial versions did not violate their privilege to remain silent at the third. [20] Nor do the rules authorizing introduction of prior-trial testimony feature an exemption of that given by an accused. [21] And while wholesale transscriptive renditions are decidedly less desirable than live evidentiary presentations, we cannot chide the practice where the testimony of witnesses no longer available is indispensable to proof of elements of the Government's case and is confined to that purpose. We are thus brought to appellants' contention that their testimony was involuntary because it was incited by the admission of the subsequently banned post-arrest statements, and on that basis was insulated against prosecutive service at the third trial.

■ Our federal system bestows upon an accused the choice of testifying or not,

16. Smith v. United States, 360 U.S. 1, 10, 79 S.Ct. 991, 997, 3 L.Ed.2d 1041 (1959).

17. United States v. Ewell, *supra* note 11, 383 U.S. at 120, 86 S.Ct. at 776.

18. See United States v. Ewell, *supra* note 11, 383 U.S. at 121–123, 86 S.Ct. 773; Hedgepeth v. United States, *supra* note 9, 364 F.2d at 687.

19. See *supra* note 15.

20. Edmonds v. United States, 106 U.S.App. D.C. 373, 375–378, 273 F.2d 108, 110–113 (*en banc* 1959), cert. denied 362 U. S. 977, 80 S.Ct. 1062, 4 L.Ed.2d 1012 (1960); Warde v. United States, 81 U.S.

App.D.C. 355, 158 F.2d 651 (1946). Compare Milton v. United States, 71 App. D.C. 394, 110 F.2d 556 (1940). See also Orth v. United States, 252 F. 569 (4th Cir. 1918); Heller v. United States, 57 F. 2d 627 (7th Cir.), cert. denied 286 U.S. 567, 52 S.Ct. 647, 76 L.Ed. 1298 (1932); United States v. Grunewald, 164 F.Supp. 644 (S.D.N.Y.1958); People v. Corbo, 17 A.D.2d 351, 234 N.Y.S.2d 662 (1962); Rafferty v. State, 91 Tenn. 655, 16 S.W. 728 (1891). See generally McCormick, Evidence, § 131 (1954); Annot. 5 A.L. R.2d 1404 (1949).

21. See the cases cited *supra* note 20.

and permits what he says from the witness stand to be used against him if not elicited coercively. The record contains no suggestion that the use of the statements at the second trial was a maneuver to wring evidence from appellants; from aught that appears, the Government's sole objective was to supply missing elements of its case. Here, unlike situations where duress of some sort has been found, the Government exerted no pressure,[22] offered no inducement[23] and imposed no improper condition upon appellants' right to muteness.[24] There was uninhibited access to counsel,[25] and, so far as we can perceive, complete awareness of legal rights.[26] We have been referred to no case, and our own intensive research has located none, holding that the strength of the Government's case is itself a vitiating form of testimonial compulsion.

We may profitably resort to an analogy that to us is quite persuasive. If appellants, with their counsel present, and thus presumably cognizant of their prerogatives, had voluntarily spoken extrajudicially, their utterances would have been admissable on the Government's proffer. This would be so, we think it clear, even if the remarks had attempted exoneration in the face of strong or even overwhelming indicia of guilt. We are unable to dissent from these results when, with the same predicates in the case before us, the statements were made at a judicial trial, where appellants were surrounded by the full panoply of legal protections. Their second-trial accounts of the fatal episode lost none of their qualities of admissibility merely because they were rendered in open court or were induced by an evaluation of the capabilities of the Government's proof to convict.

██ Nor do we consider the re-read portion of appellants' testimony to be proscribed by the familiar "fruit of the poisonous tree" rationale. We may assume, as appellants assert, that had their post-arrest declarations not gotten into evidence at the second trial, they would not have taken the witness stand. The vital inquiry, however, for ascertaining productivity as between the improper admission of the statements and appellants' countervailing testimony is not whether "but for" receipt of the statements the testimony would not have been given, but " 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' "[27]

There is, we again note, not even a whisper that the Government, in utilizing the statements at the second trial, was motivated by a purpose to elicit a testimonial response from appellants. Moreover, as we have several times held, the testimony of a live witness does not stand on the same evidentiary footing with "an inanimate and immutable object illegally come by."[28] We have em-

---

22. Compare, e. g., Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961); Payne v. Arkansas, 356 U.S. 560, 78 S. Ct. 844, 2 L.Ed.2d 975 (1958).

23. Compare, e. g., Spano v. People of State of New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959).

24. Compare, e. g., Garrity v. State of New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967); Spevack v. Klein, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967).

25. Compare, e. g., Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L. Ed.2d 977 (1964); Haynes v. State of Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963).

26. Compare, e. g., Davis v. State of North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966).

27. Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), quoting Maguire, Evidence of Guilt 221 (1959).

28. Brown v. United States, 126 U.S.App. D.C. 134, 375 F.2d 310. December 30, 1966. See also McLindon v. United States, 117 U.S.App.D.C. 283, 285–286, 329 F.2d 238, 240–241 (1964); Smith v. United States, 117 U.S.App.D.C. 1, 3,

phasized that the witness "is an individual human personality whose attributes of will, perception, memory and volition interact to determine what testimony he will give." [29] While his testimony would, of course, be impermissible if obtained by capitalizing on prior illegality,[30] the question is always "how great a part the particular manifestation of 'individual human personality' played in the ultimate receipt of the testimony in question." [31]

Here the role of the "individual human personality," we think, was paramount. What is true of a volitional exercise by a witness whose testimony may be compelled must, absent coercion, be the more so as to an accused who enjoys an absolute privilege to stay silent and, as well, the professional advice of competent counsel as to whether the privilege is to be renounced. Appellants admittedly made a conscious tactical decision to seek acquittal by taking the stand after their in-custody statements had been let in, and the record reflects an appreciable interval for the interaction of mental processes preceding this decision and the testimonial acts themselves.[32] It would be rash to assume that defendants facing the death penalty upon conviction would be unduly influenced to testify favorably to the Government by either the introduction of the prior confessions or their procurement three years previously. In the circumstances here, we deem the relationship between the erroneous admission of appellants' statements and their testimony at the second trial to be "so attenuated as to dissipate the taint." [33]

## III

We now scrutinize the evidence to test its legal sufficiency to support Harrison's conviction of felony-murder. The Government's theory, we reiterate, was that he and his co-defendants conspired to rob Brown and that Harrison shot Brown while attempting to consummate the plot. Harrison's retort, made testimonially at the second trial, was that the charge which fatally wounded Brown was fired accidentally as he approached Brown for a loan on his shotgun. Since there were no living eyewitnesses to the shooting save Harrison and possibly White, the Government's case was largely circumstantial.

Shortly after 9:00 a. m. on March 8, 1960, Brown's body was found just inside the front door of his residence. The door, which opened inwardly, was closed, wedged by the body propped face-first against it. The window in the door had been shattered by a force originating externally and there was a hole through the window shade. There were powder burns on Brown's face and the window shade. Brown had died from a wound inflicted by a single blast from a shotgun. The charge had traveled through his head from front to back along an approximately horizontal course veering slightly from right to left.

On the night before the homicide, appellants and Sampson borrowed a black Buick sedan from a friend. About 8:00 o'clock on the next morning—approximately an hour prior to Brown's death—they reassembled in the Buick, and shortly thereafter were linked to the deceased. A Government witness, Thomas Young, seated with Brown in a restaurant that

---

324 F.2d 879, 881 (1963), cert. denied 377 U.S. 954, 84 S.Ct. 1632, 12 L.Ed.2d 498 (1964); Payne v. United States, 111 U.S.App.D.C. 94, 97–98, 294 F.2d 723, 726–727, cert. denied 368 U.S. 883, 82 S.Ct. 131, 7 L.Ed.2d 83 (1961).

29. Smith v. United States, *supra* note 28, 117 U.S.App.D.C. at 3, 324 F.2d at 881.

30. See, e. *g.*, Smith v. United States, 120 U.S.App.D.C. 160, 344 F.2d 545 (1965).

31. McLindon v. United States, *supra* note 28, 117 U.S.App.D.C. at 286 n. 2, 329 F. 2d at 241 n. 2.

32. See Brown v. United States, *supra* note 28, 375 F.2d at 318 (concurring opinion).

33. Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939).

morning noticed Sampson looking at Brown. When Young and Brown left the restaurant, Sampson followed and walked a short distance to a black Buick in which two men were seated. While conversing with Brown, Young saw Sampson talking to the men inside the Buick minutes before Brown drove off alone.

It is undisputed that not appreciably later Harrison and his companions arrived at Brown's house in the Buick. One version of the events then transpiring was supplied by Harrison's own testimony. In contemplation of a loan from Brown to be obtained upon a pawn of his shotgun, he had placed the weapon in the Buick earlier that morning, unaware of the fact that it was loaded. Alighting at Brown's house, he removed the shotgun from the car and carried it at his side to Brown's front door. Brown responded to his knock, opened the door and, learning of the transaction Harrison had in mind, said "Let me see it, come on in." Entering, Harrison raised the shotgun from his side in order that Brown might examine it but Brown suddenly pushed the door closed. The glass in the door struck the shotgun and caused it to discharge. Harrison then ran, colliding with White who stood outside on the steps nearby. Both rejoined Sampson in the Buick and together they made off.

But while Harrison's testimony was the largest segment of direct evidence bearing on the affair, the Government's case, and to some extent Harrison's own defense, disclosed circumstances impinging upon the story he related. There is evidence indicating that the shotgun had been aimed at Brown. The shot, fired through the front door window, left a gaping, macerated wound in the right side of Brown's face, and Brown was six feet tall. The trajectory of the charge through Brown's head suggests that the shotgun when fired had not only been raised, as Harrison said, but was in a nearly horizontal position at shoulder level. However this may be, it is immaterial whether the shotgun was discharged intentionally or accidentally if in fact a robbery was then being attempted.[34] And we deem the proof legally sufficient to support a verdict predicated upon the thesis that such was the case.

There was evidence tending to show that both Harrison and White needed money. Harrison proposed to borrow money from Brown. White used marijuana cigarettes, and was unemployed. Admittedly, both had gotten together earlier that day to look for a job. Brown had money, and that this fact was known is also clearly suggested. Harrison knew that Brown was a "fence" and had previously dealt with him in that capacity. About $2,000 was found in Brown's pocket after his death. Young testified that he knew that Brown had money on his person that day.

The evidence also indicated circumstantially an intent to rob Brown. Harrison, with White and Sampson, had borrowed an automobile the night before. The jurors could have believed Young's testimony that he saw Sampson at the restaurant and found that he then had Brown under surveillance. They might also have accepted the inference from Young's testimony that appellants were the other two men in the Buick. They could have concluded that something involving appellants and the deceased was afoot.

Harrison approached Brown's residence with a shotgun that was loaded.[35] It was a weapon that could easily have been concealed under his coat.[36] Harrison said that White was with him in

---

34. See *supra* note 1; Harrison v. United States, *supra* note 5, 123 U.S.App.D.C. at 236 n. 17, 359 F.2d at 220 n. 17.

35. Compare Accardo v. United States, 102 U.S.App.D.C. 4, 249 F.2d 519 (1957), *cert. denied* 356 U.S. 943, 78 S.Ct. 787, 2 L.Ed.2d 817 (1958).

36. A Government witness residing across the street from Brown's house saw a male come out of Brown's doorway immediately after the shot "and put something under his coat, a gun, and ran down the street * * *"

the vestibule of Brown's residence when the fatal shot was fired. Sampson concededly remained in the automobile parked nearby. After Brown was shot, neither Harrison nor White stopped to render possible aid, but instead took immediate flight.[37] The jury was not bound to ignore these earmarks of a planned robbery by two co-conspirators with the third standing by with the getaway car. And if the jury rejected Harrison's explanation that the shooting was committed accidentally under innocent circumstances, the evidence was sufficient to support a verdict predicated upon the view that it occurred while a robbery was in progress.

▮▮▮ The crucial inquiry called for is not whether we ourselves are convinced beyond a reasonable doubt of Harrison's guilt but whether on the proof adduced the jury legitimately could have been. Our role in making this adjudication "is exhausted when [we determine] * * * that the evidence does or does not permit the conclusion of guilt beyond reasonable doubt within the fair operation of a reasonable mind."[38] We conclude that as to Harrison it does.

### IV

We turn next to considerations peculiarly affecting White. He had taken the stand as a witness in his own behalf at both of the first two trials. During the second trial, the Government resorted to parts of his testimony at the first trial in an effort to cast doubt on what he said at the second, and the portions of his second-trial testimony read to the jury at the third trial included sizeable excerpts from the testimony he had given at the first trial. The fact that he was represented at the first trial by the impostor Morgan spotlights the problem: at the trial from which the instant appeal was taken, the Government's evidentiary presentation embraced testimony White had given at the first trial when he was not represented by a member of the bar.

▮▮▮ The Sixth Amendment pledges that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defence." This adjuration necessitates "the guiding hand of counsel at every step in the proceedings against him,"[39] including "the giving of effective aid in the preparation and trial of the case."[40] It is clear that these demands are not satisfied when the accused is "represented" by a layman masquerading as a qualified attorney;[41] it is unthinkable that so precious a right, or so grave a responsibility, can be entrusted to one who has not been admitted to the practice of the law, no matter how intelligent or well educated he may be. This is particularly so where, as here, the accused is on trial for an offense upon conviction of which his very life could become forfeit.

▮▮▮ Failure to heed the constitutional admonition that the accused enjoy the right to assistance of counsel negates completely the court's jurisdiction to proceed.[42] The proceeding is void, the occurrences therein are vitiated; transpirations otherwise legal go for naught.

37. See Miller v. United States, 116 U.S. App.D.C. 45, 320 F.2d 767 (1963); Hunt v. United States, 115 U.S.App.D.C. 1, 4, 316 F.2d 652, 655 (1963).

38. Curley v. United States, 81 U.S.App. D.C. 389, 392, 160 F.2d 229, 232, cert. denied 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947).

39. Powell v. State of Alabama, 287 U.S. 45, 69, 53 S.Ct. 55, 64, 77 L.Ed. 158 (1932).

40. Id. at 71, 53 S.Ct. at 65.

41. Representation by unlicensed "counsel" was held to deny constitutional rights in McKinzie v. Ellis, 287 F.2d 549 (5th Cir. 1961); Jones v. State, 57 Ga.App. 344, 195 S.E. 316 (1938); Smith v. Buchanan, 291 Ky. 44, 163 S.W.2d 5, 145 A.L.R. 813 (1942); Jackson v. State, 316 P.2d 213 (Okl.Crim.1957); Martinez v. State, 167 Tex.Crim. 97, 318 S.W.2d 66 (1958). See also Achtien v. Dowd, 117 F.2d 989 (7th Cir. 1941).

42. Johnson v. Zerbst, 304 U.S. 458, 468, 58 S.Ct. 1019, 82 L.Ed. 1461 (1939); Coplon v. United States, 89 U.S.App.D.C. 103, 113–114, 191 F.2d 749, 759–760 (1951), cert. denied 342 U.S. 926, 72 S.Ct. 363, 96 L.Ed. 690 (1952).

No less than this was implicit in our disposition of this case shortly after Morgan's deception was uncovered as we had occasion to observe upon the second appeal.[43]

It cannot be doubted that the Government's introduction into evidence of the statements White made during a period when he was without counsel impinges rights the Constitution renders inviolate. A quarter of a century ago, this Court, in Wood v. United States,[44] appraised the effect of a denial of the right to counsel upon the accused's privilege against self-incrimination. We held that a withdrawn plea of guilty entered by an uncounseled defendant at a preliminary hearing was improperly received in evidence at the trial and regarded the absence of counsel as a key factor in determining whether the plea was voluntarily entered. Quite recently the Supreme Court, in White v. State of Maryland,[45] reached the same result through application of the Sixth Amendment to an identical situation, and subsequent decisions have epitomized the Amendment's ban upon evidentiary uses of statements made by an accused at a time when he was entitled to but not accorded the assistance of competent counsel.[46]

The prejudice resulting from admission of White's first-trial testimony is apparent. The strongest evidence at the third trial linking White to the crime was his own testimony at the second trial, without which there is little to place him immediately at the scene of the shooting or to involve him in preparations to rob Brown. Thus it was crucial to the Government's case that White's second-trial testimony be discredited, and in this the impeaching statements from the first trial played a central role.

At the second trial, White stated that he did not know why Harrison wanted to see Brown and maintained that he did not see Harrison place anything into or remove anything from the back seat of the car before Harrison went to Brown's house. The Government countered with testimony that he had seen an object placed on the back seat and that on its removal he had noted that it was a shotgun. White also testified at the second trial that he could not see which house Harrison went into, and was confronted with his previous testimony indicating that he had seen the house. White later testified at the second trial that he did not follow Harrison into the vestibule of Brown's house, and the prosecutor brought forward statements made at the first trial suggesting that he had gone to the vestibule. Finally, White swore at the second trial that he was smoking marijuana on the morning of the homicide and that his senses were confused. The Government responded with White's testimony at the first trial omitting all reference to marijuana or disorientation.

It cannot be doubted that the impact of White's first-trial statements upon his second-trial assertions of innocence and his credibility was devastating. Four material aspects of his story were impugned: that he did not know that Harrison had a shotgun, that he was initially unaware of the fact that Harrison went to Brown's house, that he was not in the vestibule when the shotgun was fired, and his mind was befuddled by marijuana. And each of the damaging statements had been elicited on White's direct examination by Morgan, his erstwhile protector.

We are unable to find any exception which would eliminate this situation from a conventional application of the governing constitutional mandate. Cer-

---

43. Harrison v. United States, *supra* note 5. 123 U.S.App.D.C. at 233, 359 F.2d at 217.

44. 75 U.S.App.D.C. 274, 128 F.2d 265, 141 A.L.R. 1318 (1942).

45. 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963).

46. Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); Escobedo v. State of Illinois, *supra* note 25; Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

tainly none is created by the fact that White originally offered the statements for exculpatory purposes since they were ultimately used to incriminate.[47] Nor were they "sweeping claim[s]"[48] on "collateral matters"[49] so "remote from the issue of guilt"[50] as to fall within the principle authorizing impeachment by an otherwise inadmissible statement in limited and guarded circumstances.[51]

We have noted that there was only a general protest on broad constitutional grounds to the admission of any of White's previous testimony at the third trial rather than objection directed specifically to the portions we find inadmissible or to the reasons we have stated.[52] And we are naturally reluctant to reverse the conviction of a defendant three juries have found to be guilty. But neither of these considerations permits us to ignore serious and harmful error[53] of constitutional proportions[54] involving the admission of harmful evidence in a capital case.[55]

## V

There is no occasion for extending to Harrison the ruling just made as to White. Harrison was represented by a competent, licensed attorney at the first trial until some point after the evidence was all in.[56] Moreover, none of Harrison's testimony at that trial was used or referred to at the second trial, so nothing therefrom got before the jury at the third. The factual predicates for our disposition as to White are entirely lacking as to Harrison.

White's first-trial statements, however, read to the jury at the third trial, implicated Harrison to the extent we hereinafter mark. On this account, we have pondered the question whether this requires reversal of Harrison's conviction. We have decided, for reasons now to be explained, that it does not.

We might rest our conclusion in this regard upon an application of the principle that evidence not inherently untrustworthy having relevance to the guilt of an accused is not excludable simply because it was elicited in violation of the rights of another.[57] Nonetheless, we have expanded our investigation broadly enough to satisfy ourselves that White's

47. See Miranda v. State of Arizona, *supra* note 46, 384 U.S. at 444, 86 S.Ct. 1602; Wong Sun v. United States, *supra* note 27, 371 U.S. at 487, 83 S.Ct. 407.

48. Walder v. United States, 347 U.S. 62, 65, 74 S.Ct. 354, 98 L.Ed. 503 (1954).

49. Tate v. United States, 109 U.S.App.D.C. 13, 17, 283 F.2d 377, 381 (1960).

50. Carter v. United States, No. 20,091, D.C.Cir., March 2, 1967 at 2. See also Bailey v. United States, 117 U.S.App.D.C. 241, 328 F.2d 542, cert. denied 377 U.S. 972, 84 S.Ct. 1655, 12 L.Ed.2d 741 (1964); Barkley v. United States, 116 U.S.App. D.C. 334, 335–336 n. 1, 323 F.2d 804, 805–806 n. 1 (1963).

51. See cases cited *supra* notes 48 to 50. See also Inge v. United States, 123 U.S. App.D.C. 6, 356 F.2d 345 (1966); Johnson v. United States, 120 U.S.App.D.C. 69, 344 F.2d 163 (1964); Brown v. United States, 119 U.S.App.D.C. 203, 338 F. 2d 543 (1964).

52. See F.R.Crim.P. 51.

53. See Oliver v. United States, 118 U.S. App.D.C. 302, 335 F.2d 724, cert. denied 379 U.S. 980, 85 S.Ct. 686, 13 L.Ed.2d 571

(1964); Williams v. United States, 105 U.S.App.D.C. 41, 263 F.2d 487 (1959); Mills v. United States, 97 U.S.App.D.C. 131, 228 F.2d 645 (1955); Robertson v. United States, 84 U.S.App.D.C. 185, 171 F.2d 345 (1948).

54. United States v. Atkinson, 297 U.S. 157, 56 S.Ct. 391, 80 L.Ed. 394 (1936); Kohatsu v. United States, 351 F.2d 898, 901 n. 4 (9th Cir. 1965), cert. denied 384 U.S. 1011, 86 S.Ct. 1915, 16 L.Ed.2d 1017 (1966).

55. F.R.Crim.P. 52(b). See also Naples v. United States, 120 U.S.App.D.C. 123, 128, 344 F.2d 508, 513 (1964); Stewart v. United States, 101 U.S.App.D.C. 51, 247 F.2d 42 (1957).

56. See *supra* note 4.

57. See Long v. United States, 124 U.S.App. D.C. 14, 360 F.2d 829, 834 (1966); Bowman v. United States, 350 F.2d 913, 916 (9th Cir. 1965), cert. denied 383 U.S. 950, 86 S.Ct. 1209, 16 L.Ed.2d 212 (1966); 8 Wigmore, Evidence § 2270 (McNaughton rev. 1961); McCormick, Evidence § 73 (1954). Compare Jones v. United States, 119 U.S.App.D.C. 284, 342 F.2d 863 (*en banc* 1964).

re-read concessions could not have prejudiced Harrison. White's first-trial statements could have persuaded findings that Harrison transported a shotgun in the Buick and that he took it with him to Brown's house, but these events were not disputed by Harrison. Nor could White's testimony as to whether he was smoking marijuana on the day Brown died have affected detrimentally Harrison's accounts of what occurred at Brown's doorway.

There remains, then, only the query whether Harrison could have been harmed by White's first-trial admission that he was in the vestibule of Brown's house when the shotgun erupted. The jury at the third trial heard the testimony Harrison gave at the second trial that he was alone in the vestibule at the time and in his flight collided with White a short distance outside on the steps. We recognize that this discordance may have had some tendency to undermine Harrison's credibility and to suggest a common scheme to rob, but we assess its proclivities in either respect as trivial. The verdict as to Harrison was sustainable quite apart from any element of conspiracy, to which White's earlier statement could only weakly and tangentially contribute. And Harrison's testimony conflicted seriously with that of others, and mirrored its own internal inconsistencies and gaps at a number of crucial points. We are unwilling to say that its slight incompatibility with White's, viewed in the light of other more serious evidentiary variations and uncertainties, warrants a jury's evaluation of Harrison's criminal responsibility for the fourth time.

We affirm Harrison's conviction. As to White, we reverse and remand for a new trial.

So ordered.

1. Defendants' first conviction was vacated because one of them was represented at trial by a layman representing himself as an attorney. Reference to defendants' previous trial is to their second trial.

Before BAZELON, Chief Judge, and DANAHER, BURGER, WRIGHT, MCGOWAN, TAMM, LEVENTHAL and ROBINSON, Circuit Judges, in Chambers.

## ORDER ON PETITION FOR RE-HEARING EN BANC

### PER CURIAM.

On consideration of appellant's petition for rehearing *en banc*, it is

Ordered by the court *en banc* that appellant's aforesaid petition is denied.

Statement of Chief Judge BAZELON why he believes the petition for rehearing *en banc* should be granted.

### BAZELON, Chief Judge:

At a previous trial of defendants,[1] the Government introduced several of their incriminating statements. The defendants testified in their own behalf. They were convicted, and on appeal we reversed and remanded for a new trial on the ground that the statements had been illegally obtained.[2] At the new trial now under review the defendants did not testify, but the Government read into the record sections of their testimony at the prior trial. They were again convicted. In this appeal, the court rejected their contention that their testimony was inadmissible since its purpose was to rebut the illegally obtained statements.[3]

Although the court assumes that the defendants would not have testified at the prior trial if their illegally obtained statements had not been introduced, it holds that there was no evidence of governmental duress in the form of "pressure" or "inducement" to compel the defendants to waive their Constitutional right to remain silent. And the court also holds that the prior-trial testimony

2. 123 U.S.App.D.C. 230, 359 F.2d 214 (1965).

3. As to one of the appellants, however, the court reversed the conviction on other grounds. Only appellant Harrison petitions for rehearing en banc.

itself was not the "fruit of the poisonous tree," because the defendants were "individual human personalit[ies] whose attributes of will, perception, memory, and volition interact[ed] to determine what testimony [they would] give." Smith and Bowden v. United States, 117 U.S. App.D.C. 1, 324 F.2d 879 (1963).

It seems plain to me, however, that the defendants' decision to testify was compelled by the need to rebut the statements erroneously admitted in evidence. In Griffin v. State of California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), the Supreme Court held that adverse comment by the court or the prosecutor upon a defendant's failure to testify "cuts down on the [Constitutional] privilege [to remain silent] by making its assertion costly." In the present case, the cost of exercising the privilege was even greater. The erroneously admitted statements left the defendants with a "Hobson's Choice": remain silent and allow the jury to consider the highly damaging statements, or testify and seek to rebut them. Neither time, nor the benefit of counsel, for considering this choice could alleviate the "damned-if-you-do-damned-if-you-don't" alternative.[4]

Because I think the decision to testify was compelled, it is unnecessary to consider the questions of attenuation reached by the court.[5] I would grant the petition for rehearing en banc.[6]

J. SKELLY WRIGHT, Circuit Judge, would grant appellant's petition for rehearing *en banc* and concurs with the statement of BAZELON, Chief Judge.

4. In Edmonds v. United States, 106 U.S. App.D.C. 373, 273 F.2d 108 (1959) (en banc), the introduction of prior-trial testimony was approved. But there the testimony in question was not given in response to evidence illegally obtained and admitted.

5. In any event, *Smith and Bowden* and its progeny are inapplicable since they in-

volved witnesses who were not defendants and thus there was no question of testimonial compulsion.

6. Compare People v. Polk, 63 Cal.2d 443, 47 Cal.Rptr. 1, 406 P.2d 641 (1965), cert. denied, 384 U.S. 1010, 86 S.Ct. 1914, 16 L.Ed.2d 1016 (1966) (Traynor, C. J.).