THE STATE OF OHIO, APPELLEE, *v.* WELLMAN, APPELLANT.

[Cite as State v. Wellman (1975), 45 Ohio App. 2d 264.]

(No. 5-076—Decided March 31, 1975.)

*Mr. Theodore Klammer,* for appellee.
*Mr. Albert L. Purola,* for appellant.

DAHLING, J. This is an appeal from the Court of Common Pleas of Lake County. In April, 1971, the defendant, the appellant herein, was indicted by a Lake County grand jury on a charge that on or about November 27, 1970, he did receive or conceal horse bridles and horse saddles of a value in excess of sixty dollars, the personal property of the Lake Erie College, knowing such property to have been stolen, a violation of R. C. 2907.30.

He went to trial before a jury on that indictment on May 1, 1972, without counsel, and was convicted. The Court of Appeals affirmed the judgment on May 29, 1973. The defendant than appealed to the Ohio Supreme Court, solely

on the question of counsel, and that court reversed the conviction and remanded the cause for further proceedings according to law on March 27, 1974.

On June 13, 1974, the case was retried to a jury, at which time the defendant, with counsel, was convicted. It is from this judgment of conviction that the case is now before this court.

Defendant has assigned eight errors, which are as follows:

"1. The trial court erred in overruling the defendant's Motion to Dismiss on the grounds of former jeopardy as the defendant had previously been convicted of the same offense.

"2. The trial court erred in not directing a judgment of acquittal at the close of the state's case inasmuch as the evidence of the defendant's knowledge was circumstantial and not wholly inconsistent with every theory of his innocence.

"3. The trial court erred in not directing a judgment of acquittal at the close of the state's case as to concealing of stolen property, there being no evidence that the property was ever concealed.

"4. The trial court erred in proceeding with the trial on June 13, 1974, and overruling the defendant's Motion for a Continuance such actions amounting to a denial of the assistance of counsel and a denial of the right to reasonable notice and to discovery.

"5. The trial court erred in allowing witnesses for the state to testify who had refreshed their recollection from the transcript of the previous trial where the defendant was without counsel and in allowing the state to utilize the transcript of the first trial for the purposes of impeaching the defendant's testimony.

"6. The trial court erred in instructing the jury that receiving and concealing are separate offenses.

"7. The trial court erred in not allowing the admission into evidence of Joint Exhibit One and not allowing the testimony of one witness relative to that exhibit.

"8. The trial court erred in denying the defendant a

transcript of the proceedings for purposes of appeal at public expense after having found him indigent."

As to the first assignment of error, we find it to be without merit. Defendant argues former jeopardy because of "judicial over-reaching" in the first trial by the trial court's refusal to provide defendant legal counsel; and second, that a retrial is impermissible since there was a reversal on an issue (refusal to provide legal counsel) that in no way affects any of the issues that were litigated and leaves the decided question completely intact.

Here, the defendant had been declared indigent and had been provided legal counsel by entry filed April 29, 1971. On October 8, 1971, his court-appointed attorney wrote as follows to the clerk of courts:

"Gentlemen:
Please be advised that I no longer represent Herbert Wellman in the above-assigned numbered cases. Due to irreconcilable differences he has advised me that he will make other arrangements for legal representation. He has been advised that his case has been set for trial for November 8, 1971 at 9:00 A. M. Therefore, if it meets with the Court's approval, I respectfully ask that my name be withdrawn as counsel for Herbert Wellman."
/s/ Alfred Denman

On April 25, 1972, his privately retained counsel wrote to the trial judge as follows:

"This is to advise you that although my name appears as the attorney of record for the defendant, Herbert Wellman, in Case No. 7233, that I have not been retained by Mr. Wellman to represent him in this matter and have never discussed any of this case with him. While I have written several times inquiring of Mr. Wellman what his intentions are in dealing with this matter, I have never had a response.

"Therefore, I am requesting that you withdraw my name as attorney of record for the defendent in the captioned case because I can only conclude that the defendant does not choose to have me represent him in this matter. I have advised the defendant of the pre-trial hearing schedul-

ed for April 28th at 9:30 A. M. and I suspect that he will make other arrangements for representation by counsel.

"Thank you for your understanding in this matter. "/s/ Albert L. Purola"

On the day of trial, after the jury had been impaneled, defendant made a motion for legal counsel which the trial judge overruled. Under these conditions, we do not agree with defendant's claim of a "judicial over-reaching." Defendant cited no authority for the argument that a retrial is impermissible where the first conviction is overturned because of a denial of counsel, and we find this argument to be without merit.

Defendant's second assignment of error is that the trial court erred in not directing a judgment of acquittal at the close of the state's case inasmuch as the evidence of defendant's knowledge that the property had been stolen was circumstantial and not wholly inconsistent with every theory of his innocence.

There was evidence at the trial that defendant grew up and was familiar with Morley Farms, from where the property was stolen. Also, the following discussion between defendant and the state's witness, Chester Guzowski took place in early November, 1970, when defendant went to Guzowski's apartment:

"A. He came over and asked me if I knew anybody who knew anything about saddles.

"Q. Did you respond to that?

"A. Yes, sir. I told him that I did.

"Q. What did you say?

"A. I asked him if he had them.

"Q. And, did he respond to that?

"A. He said that they are as good as got.

"Q. He said, 'They are as good as got'?

"A. Yes, sir.

"Q. Did you have any other conversation?

"A. I asked if they were going to be hot and he said that they would.

"Q. They would be?

"A. They would be hot.

"Q. What is your meaning of hot?

"A. Stolen."

Finally, there was testimony that defendant went to Kettle Brick Farm about two weeks later and sold four saddles for two hundred and fifty dollars. Accordingly, we find defendant's second assignment of error to be without merit.

The third assignment of error is without merit. The indictment charged defendant with "receiving or concealing" and there was no evidence of concealing. Defendant contends that the trial court was obliged to direct a verdict and judgment of acquittal as to the disjunctive "concealing" as it appeared in the indictment and remove that charge from jury consideration.

We agree that there was no evidence of concealing and also that defendant by timely motion brought this to the trial court's attention. However, we disagree that this required the trial court to direct a judgment of acquittal; instead, the trial court should have stricken "concealing" from the indictment and removed it from the jury's consideration.

We find defendant's fourth assignment of error to be without merit. Defendant's attorney was given one week to prepare for trial after having been notified by the trial court. We find no abuse of discretion in this regard.

We find defendant's fifth assignment of error to be without merit as to allowing witnesses of the state to refresh their recollection from the transcript of the previous trial. However, that portion of the fifth assignment of error which relates to the state's utilization of the transcript of the first trial for the purpose of impeaching defendant's testimony has merit. A review of the testimony of the cross-examination and re-cross-examination of defendant shows that the error was prejudicial. Samples of this are as follows:

"Q. Do you remember testifying on a prior occasion that you took the stand?

"A. Yes, sir.

"Q. And, is it not true that on that date—that you

testified at a prior time—you stated that you knew Mr. Kincaid a year-and-a-half to two years and today you stated that you knew him for a year?

"A. Today I know him for three or four.

"Q. Today you stated that you knew him for about a year prior to the time.

"If you testified that you knew him a year-and-a-half to two years, was that correct, or what you are saying now, is that correct?

"A. I don't remember the first time—I remember the first time I met him where my brother was living—about a year—a year-and-a-half.

"Q. Do you wish to change it to a year-and-a-half?

"A. I will stay with a year.

"Q. You will stay with a year?

"A. Yes. * * *

"Q. You also testified at a prior time that the first time that you went to Mr. Muster's on the 27th, your brother went with you and today you testified that your brother stayed back and washed the saddles.

"A. My brother didn't go with me the first time.

"Q. I draw your attention to the following statement that you made—'I did not have a car. I called up my brother, who came over. After he got there, we went to see Muster, which I'd say was about 10:00 o'clock. The first time we just went over. I got out. I went over to ask Mr. Muster if he was still interested in the saddles. He said, "Yes." '

"Q. Do you remember that, sir?

"A. Yes.

"Q. Well, did your brother go with you or did he not go with you?

"A. My brother did not go with me.

"Q. He did not go with you the first time?

"A. He did not.

"Q. The prior time you were under oath. Now, do you wish to correct this?

"A. The 'we' wasn't. It was me.

"Q. It was 'me'.

"So, this also should be corrected, I take it from the prior time when you were under oath.

"A. Yes.

"Q. Just as you are now?

"A. Yes.

"Q. 'There was quite a bit of—'

"He said, 'No. I am too busy. Bring them over here.' There was quite a bit of activity going on in the yard at the time. I then went back with my brother and put the saddles in the trunk of the car and came from my house to the Kettle Brick Farm and pulled in there and was quite a bit of cars."

"A. Yes—true to that.

"Q. That is true.

"Even the first part—'There was quite a bid of activity going on in the yard at the time. I then went back with my brother and put the saddles in the trunk of the car * * *.'

"A. Would you read this to me again?

"Q. 'There was quite a bit of activity in the yard at that time.'

"A. Which time?

"Q. This is making reference to the first time. 'I then went back with my brother and put the saddles in the trunk of the car.' 'I then went back with my brother and put saddles in the trunk of the car.'

"A. I don't guess it is.

"Q. You did state that at a prior time?

"A. I imagine that I did.

"Q. What is correct—this time?

"A. My brother was not there.

"Q. Okay.

"Your wife testified that she left the house somewhere between quarter to 7:00 and 7:00 in the morning. Do you remember hearing her today as she testified?

"A. Yes.

"Q. At the prior occasion, when you were under oath, did you testify that she left the house at 7:30 in the morning?

"A. I don't know.

"Q. You have not read the statement that you had at a prior time?

"A. No, I haven't. * * *

"Q. Sir, you testified today that you wrote out a bill of sale for Kincaid, is that true?

"A. Yes.

"Q. Do you recall testifying at a prior time when you said, 'I had Kincaid write a bill of sale out after I bought the saddles.'?

"A. In a matter of speaking, that is exactly what I am saying.

"Q. Did you write it out or did he write it out?

"A. I wrote it out and he signed it.

"Q. So, do you wish to say that?

"A. That is the same thing that I said the first time.

"Q. 'I had Kincaid write a bill of sale out after I bought the saddles.'

"A. I understand. The first time I was wrong.

"Q. Did you not also say the first time 'I set them in front of the garage and wiped them off.'? Did you wipe the saddles off or did your brother wipe them off?

"A. I helped wipe the saddles off, if I haven't said that yet—yes.

"Q. This would be at what time?

"A. When I got back the first time. I helped finish up and stuck them in the trunk.

"Q. You heard your brother testify that you got back at five til 11:00 on that date?

"A. Yes.

"Q. And, that he had finished washing the saddles?

"A. Yes.

"Q. You are saying now that you came back sometime before then and helped your brother finish the saddles?

"A. Just a little bit.

"Q. So, you helped finish cleaning them off?

"A. Yes."

Also, on re-cross-examination, the following took place:

"Q. And, from the question that Mr. Purola brought

out—your prior statement under oath was that 'I had Kincaid write a bill of sale out after I bought the saddles. I set them in front of the garage and wiped them off. I did not have a car. I called up my brother, who came over. After he got them we went to see Muster, which I'd say was about 10:00 o'clock.' Do you want to correct that?

"A. It is not 'we'—I did.

"Q. You did?

"A. Yes.

"Q. Then he helped you move the saddles and then you called your brother. From what you said before, it appeared that the transaction was completed before you ever called your brother.

"A. You mean—when I bought the saddles?

"Q. That is what you said. 'I had Kincaid write a bill of sale out after I bought the saddles. I set them in front of the garage and wiped them off. I did not have a car. I called up my brother, who came over.' That is what you said before when you were under oath, sitting in the very same seat that you are sitting in now.

"A. Yes, sir.

"Q. Do you wish to change that?

"A. Partially. This statement made this time—

"Q. This statement is exactly what happened?

"A. Which one?

"Q. The one that I mentioned before to you— is that correct?

"A. Part of that. I wrote the bill of sale before my brother got there.

"Q. You were under oath at that time?

"A. Yes, sir."

Headnote 14 in *Harrison* v. *United States* (D. C. Cir. 1967), 387 F. 2d 203, states:

"Failure to heed constitutional admonition of right of defendant to assistance of counsel negates completely court's jurisdiction to proceed, the proceedings are void, occurrences therein vitiated and transpirations otherwise legal go for naught."

Headnote 15 reads:

"Government's introduction at third murder trial of crucial testimony given by defendant at his first trial at which he did not have the constitutionally guaranteed right to assistance of counsel impinged on defendant's constitutional rights requiring a reversal of his conviction for felony murder."

It cannot be doubted that the impact of defendant's statements at his first trial was to impeach his credibility on the second trial. Five material aspects of his story were impugned:

1. The length of time he knew Kincaid;
2. Who wrote out the bill of sale from Kincaid;
3. Whether defendant's brother went with him to see Mr. Muster;
4. The time his wife left the house; and
5. Who washed off the saddles.

We find that defendant's sixth assignment of error has merit and it was prejudicial error to instruct the jury that receiving and concealing are separate offenses. Receiving stolen property and concealing such are two methods by which a single offense can be committed.

Also, the verdict form was erroneous. It stated:

"We, the Jury in this case, duly impaneled and sworn and affirmed, find the defendant Herb Wellman, Guilty of Receiving or Concealing Stolen Property, in manner and form as he stands charged in the indictment, and we find the value of the property received or concealed was ———."

Under the trial court's instruction and verdict form, the jury could have found the defendant guilty of receiving and not guilty of concealing, or vice versa, or some of the jury could have found defendant guilty of receiving and some of the jury could have found him guilty of concealing. For this reason, the "receiving or concealing" is not a verdict of anything.

The indictment charges defendant: " * * * unlawfully did receive or conceal horse bridles and horse saddles, of the value in excess of Sixty Dollars, of the personal property of the Lake Erie College * * *."

The evidence was that the four saddles sold to Kettle

Brick Farm belonged to students and not Lake Erie College. The fifth saddle, a western saddle, had a Lake Erie College marking. However, the latter was found in a field and was not linked to the defendant.

The state moved to amend the indictment to conform to the evidence, and the motion was granted by the trial court. However, the indictment was not in fact physically amended and absolutely nothing was done on the record by the court in this regard. With regard to the verdict form, it does not relate to the orally amended indictment, but to the original indictment which was superceded by the orally amended indictment.

We find assignment of error 7 to have merit. Here the defendant attempted to offer in evidence a xerox copy of a receipt which he claimed as proof that he had purchased the saddles and they were not stolen property. The prosecutor joined with the defendant and moved that it be made a joint exhibit.

This evidence went to the crux of the indictment which was whether the defendant knew the property was stolen. This evidence should have gone to the jury for whatever weight they chose to give to it. In excluding the receipt, the trial court prejudiced the defendant in his right to have this important evidence before the jury for their consideration.

We find assignment of error No. 8 to be without merit. Counsel was appointed for the defendant on four separate times because of indigency: at his first arraignment in 1971; by the Supreme Court; by the trial court here, for the purposes of this trial; and by the trial court here, for the purposes of this appeal. An indigent defendant is entitled to all of the necessary papers for his appeal at public expense according to Criminal Rule 32(A)(2), which states:

"Notification of right to appeal. After imposing sentence in a serious offense which has gone to trial on a plea of not guilty, the court shall advise the defendant that: (a) he has a right to appeal; (b) if he is unable to pay the cost of an appeal he has the right to appeal without payment;

(c) if he is unable to obtain counsel for an appeal, counsel will be appointed without cost; (d) if he is unable to pay the costs of documents necessary to an appeal, such documents will be provided without cost; and (e) he has a right to have a notice of appeal timely filed on his behalf. Upon defendant's request the court shall forthwith appoint counsel for appeal.''

The Supreme Court of the United States in *Griffin* v. *Illinois* (1956), 351 U. S. 12, held that where a state makes appellate review available, it cannot, consistent with the Due Process Clause, preclude that review to indigent defendants solely because of their inability to pay for a transcript of the record. However, in the instant case, since defendant or his attorney secured the transcript, he cannot claim to have been prejudiced by the fact it was not provided at the taxpayer's expense. Upon the proper motion, this court will order the transcript taxed as costs. In conclusion, the judgment is reversed and this cause is remanded for further proceedings according to law.

*Judgment reversed.*

HOFSTETTER, P. J., and COOK, J., concur.